[Civ. No. 11248.   Third Dist.   Nov. 2, 1966.]

BUD KLEIN et al., Plaintiffs and Respondents, v. ASGROW SEED COMPANY et al., Defendants, Cross-defendants and Appellants; ASSOCIATED FARM SUPPLIES et al., Defendants, Cross-complainants and Appellants.

Mayall, Hurley, Knutsen & Smith, Clarence D. Knutsen, Albert E. Cronin, Jr., and Johnson, Speed & Bamford for Defendants, Cross-complainants and Appellants.

Knox, Goforth & Ricksen and Calvin T. Goforth for Defendants, Cross-defendants and Appellants.

Daley, Patridge & Garrett and Richard B. Daley for Plaintiffs and Respondents.

PIERCE, P. J.—Plaintiffs and respondents, Bud Klein, Louis Mersaroli and Reginald Mersaroli, joint venturers engaged in tomato growing, recovered damages in the sum of $14,439.32 against Associated Farm Supplies, a corporation, for breach of warranty in the sale of tomato seed in 1962. Associated, the immediate supplier, on its cross-complaint recovered judgment against its supplier of the seed, Ranch

Supply, Inc., which in turn recovered judgment against its seller, Reed Lockhart, a seed broker. The latter recovered from the Asgrow Seed Company, manufacturer of the seed. All judgments were for the same amount; all judgments (in the chain of succession of sales and purchases) were on the theory of breach of both express and implied warranty by each seller to each buyer. Plaintiffs' complaint had been against all parties, and all intermediate sellers cross-complained against Asgrow (except Associated—whose rights and liabilities with respect to Asgrow, and therefore its right to recover from and against Asgrow, were however covered in, and became an issue through, the trial court's pretrial order). Because of non-privity the trial court denied recovery to plaintiffs and to all cross-complainants (except Lockhart) directly against Asgrow. Asgrow has appealed from the judgment in favor of Lockhart; all defendant-cross-complainants have also appealed (urging principally the judgment against Asgrow should be direct and primary—with their liability secondary); plaintiffs have not appealed.

To synopsize our conclusions: We hold that the trial court correctly awarded successive judgments under the facts found because of the breach by each seed supplier (including Asgrow) of successive warranties, both express and implied, but we conclude that the trial court incorrectly held that nonprivity relieved Asgrow of direct liability. We hold its liability, regardless of absence of privity, was direct and primary. The reason: Misrepresentation of the seed sold was deliberate; there was an express warranty; there was no agreement or custom negating that warranty by disclaimer or limitation of liability at the time of the sale; had there been one it would have been against public policy; each buyer relied upon the warranty in each of the sales.

The tomato seed was sold by description. It was described as being VF-36. That variety is an early maturing, heavy producing cannery tomato. Those facts, at the time of all sales, were known by all the parties and generally throughout the trade (seed producer-growers, brokers, merchants and tomato growers). By "early maturity," in the case of VF-36 tomatoes grown in 1962 at the location and under the conditions obtaining on plaintiffs' lands, is meant that seed if planted late in March would produce tomatoes which could be expected to be ready for harvest around the last two weeks in August.

The variety VF-36 had been originally "released" by the University of California in 1959 and Asgrow procured some.

That same year from the seed so acquired it produced a stock seed crop at its Milpitas ranch for use by its production department, and a certain seed crop known as lot No. 87115 was grown (from the Milpitas seed) in Asgrow's Oxnard-Ventura "production area" in 1960 for sale in 1961. The seed ultimately sold to and sown by plaintiffs was from this lot. In 1961 Asgrow had learned from its plant breeder, Daniel Nadel, that an unknown percentage of the supposedly VF-36 seed in lot No. 87115 was "off-type."[1] Nadel was a witness at the trial. He explained that they were trying to produce a "pedigreed strain" by which he meant one "true to type." He declared that "practically all the stocks that we sell are formed from pedigreed stocks." Notwithstanding its knowledge that lot No. 87115 was not true to type but contained an unknown percentage of "rogues," Asgrow marketed the seed. Asked why, Nadel stated: "[I]t was our feeling that this was the best that we had at the time. We had nothing else—we had no improved stock to offer." He also testified: "This was the only seed available. We had no choice." He also said that Asgrow was under pressure to get into the VF-36 market. He added that it was common for Asgrow and other seed companies to make tests after they had put a tomato seed on the market. He then stated that if they did not they "would have a tremendous inventory of seed. We couldn't afford it." He added: "We have to take *our* risk in selling the seed, without having it tested." Asked by the cross-examining attorney: "*You mean you let the growers take the risk?*" he answered: "*No. We assume the risk.*" (Italics supplied.) The colloquy ended with counsel's rhetorical observation: "Oh, well I'm glad to hear that. Mr. Goforth [Asgrow's attorney] has been trying to convince me otherwise." It should also be noted that Nadel later testified: "Well, just the fact that they are off types is enough to recommend that we shouldn't grow it." (And see footnote 2, *infra*.)

There is no dispute in the testimony that the seed which is the subject of this litigation was grown, placed in sealed cans, labeled as VF-36, placed in cartons and put in the channels of trade by Asgrow without any warning whatever to anyone involved in this litigation of the known presence (but unknown percentage) of "rogues."

---

[1] Such seed, in the record, is variously referred to as "off-type," "off-brand," "off-grade," "mongrel" seed with "uniform ripening genes present,"—"rogues." Since Asgrow's plant breeder preferred the latter term we shall adopt it.

Of lot No. 87115 two hundred pounds were sold to Lockhart on January 29, 1962. On the cans sold there was, in addition to the description "VF-36," the following *in small print*: "Asgrow warrants that the seed, bulbs and plants it sells will be, at the time of delivery, as described on the container within recognized tolerances. Asgrow gives no other or further warranty, expressed or implied, Asgrow limits its liability on the foregoing warranty and its liability by reason of any other cause whatsoever to the amount of the purchase price of such seeds, bulbs, and plants." The same statement was on the invoice thereafter sent to Lockhart. The cans and cartons were never delivered to Lockhart. The invoice was delivered to Lockhart subsequent to the sale. Lockhart had no discussion with anyone connected with Asgrow as to any disclaimer or limitation of liability with reference to this sale but knew of the limitation and its terms in past transactions he had had with Asgrow. Before purchasing the seed, Lockhart had discussed its qualities with representatives of Asgrow who told him "it was an early variety, that it looked to them like it was a real tomato, and that growers could expect heavy tonnage and ripe fruit."[2]

Lockhart sold the seed (200 pounds) to Ranch Supply. Wilfred Carpenter, president of that corporation, caused it to be picked up at Asgrow's Tracy warehouse and delivered to Associated which had already purchased the seed from Ranch Supply. Both these transactions also took place on January 29, 1962. (Thus all the sales here involved except the last were consummated the same day.) The invoice to Ranch Supply and its invoice to Associated were not made out until some weeks

---

[2]Counsel for plaintiffs read to Lockhart a statement from an Asgrow brochure advertising its tomato seed, including the VF-36 variety, which it recommended. The pamphlet contained the following statement: "Asgrow tomato seeds are produced in Asgrow pedigreed seed stocks, the seed crops are grown strictly for seed under the close supervision of Asgrow field men from planting time until the seeds have been harvested. The crops are harvested with Asgrow equipment and preliminary cleaning is done at a special Asgrow installation, used only for processing Asgrow crops. This special treatment eliminates all the risks that come from 'by-product' seed. The only by-product connected with Asgrow tomato seed is the extra assurance that your seed will be clean, high-germinating and free from genetic and mechanical mixtures."

Lockhart first testified he had read this before buying the seed in question; later testified he could not be sure whether he had read it before or after the purchase. Regardless of when Lockhart had read this particular advertisement and when the brochure was, in fact, issued, its significance lies in corroborating Nadel's testimony that when Asgrow puts an unproved seed on the market it will assume the risk that the seed is true to type. (See page 91, *supra*.)

thereafter. Ranch Supply's invoice contained a statement disclaiming any warranty of "results from . . . use." Carpenter stated he had never made it a custom to inform any of his "customers that neither [his firm] nor the manufacturer of the seed stand behind their product as far as liability is concerned," and a customer making his first purchase would not learn of the limitation until later when the seed was delivered or the invoice was received and then only if he happened to read the small print.[3] The reason customers were not told of disclaimer of warranties was because Ranch Supply expected that when a customer opened the can the seed would be as represented. Asgrow salesmen had told him about the qualities of VF-36 before he had made this purchase.

Of the 200 pounds sold by Ranch Supply to Associated 35 pounds were sold by the latter to plaintiffs. Ivar Anderson, the president of Associated, had been asked by the Mersarolis whether Associated could furnish them VF-36 seed. In this conversation Anderson told them the supply was scarce but he would try to get some. After the purchase from Ranch Supply, Anderson delivered the seed to plaintiffs personally. When the seed was purchased and resold to plaintiffs Anderson was not aware of the limitation of liability on the containers and invoices of Asgrow, although he knew there was a limitation of some sort used by Asgrow, and Associated also used a disclaimer "with respect to results from . . . use." This appeared only on Associated's invoices to plaintiffs not sent until sometime after the sale. Anderson was aware of no custom in the industry of any limitation of liability to a refund of the price of the seed. He did not know that limitation had been stated by Asgrow and was unaware of its use by

---

[3]Finding X of the trial court states there was no custom known to the parties where disclaimers or limitations of liability are brought to the attention of a purchaser *at the time of sale.* In finding XII it is found that "In none of the sales of the subject seed involved herein was a limitation of liability, or a disclaimer of warranty brought to the attention of the buyer prior to the completion of the sale . . . ." It is also found therein that at the time of each of the sales the buyer did not know that his seller limited or disclaimed his liability. (In the case of the sale from Asgrow to Lockhart this finding must be read in the light of the further finding XIII: "From past dealings with the seller, REED LOCKHART knew the language and wording of said limitation of disability on the part of the seller, THE ASGROW SEED COMPANY, as it appeared on the cans and invoices." But it must also be read in the light of a part of finding VII: "At the time said seed was placed on the market, THE ASGROW SEED COMPANY knew that it was not entirely VF-36 seed, but was mixed with an unknown variety.") All of these findings are supported by substantial evidence.

any other company. He did testify that the disclaimers he had used and seen were "usually in small print as appears on [its] invoice . . . and also on Ranch Supply's invoice." He had not advised any of plaintiffs there would be any disclaimer. He testified further to having heard that Asgrow had, in the past, paid claims over and above the cost of the seed. Plaintiffs, when they purchased the seed, were not aware of any disclaimers or limitations of liability nor did they notice Asgrow's limitation of liability on the cans.

In 1962 plaintiffs farmed three separate fields to tomatoes, N-7, N-8 and N-10. The supposedly VF-36 tomato seed was planted in field N-8 on March 27-29. Plaintiffs planned the picking in the following order: Field N-8 first, N-10 second and N-7 last. It was contemplated that field N-8 (containing 51.5 acres) would be ready for harvest first, approximately on August 21, because it was the earliest maturity. (In fact there was evidence in the record that in 1962 VF-36 tomatoes were the earliest canning variety on the market.) This planning was to insure a progression of use of the labor supply and to control cannery deliveries. Plaintiffs were unable to follow their programmed schedule; the reasons: more than a majority of the tomatoes in field N-8 were, as the court found, not VF-36 but "an unknown variety, and did not mature until early in the month of October, 1962." These "rogue" plants were scattered throughout the field. The VF-36 tomatoes in the field were ready for harvest in late August but could not then be harvested with economic feasibility due to the predominance of "rogues." By the time the latter were ready for harvest the first crown setting on the VF-36 tomatoes had rotted. Rain early in October may have complicated the problem. The court found that "plaintiffs lost one-half of the tomatoes [in field N-8] of a reasonable market value, after deduction of expenses . . . in the sum of $14,439.32." Notice of the loss was seasonably given.

SUBSTANTIAL EVIDENCE SUPPORTS THE COURT'S
FINDING THAT THE "ROGUE" TOMATOES WERE THE
LATE MATURING ONES AND CAUSED THE LOSS.

■ There is no merit to Asgrow's first contention that there was no evidence of "ponderable legal significance" to support the trial court's finding that the later maturing tomatoes were the "rogues." Asgrow agrees in its brief that more than a majority of the tomato seed planted in field N-8 produced late-maturing tomatoes, in fact it places the quantity at

70 percent.[4] It urges, however, that the tomatoes which matured late were the VF-36 variety while the "rogues" were the ones which matured early. The process of reasoning by which it reaches that conclusion is to accept all of the testimony of plaintiffs' witnesses regarding the fact that this vast majority of tomatoes grown in said field were late maturing but it asks us to reject all of the testimony of plaintiffs' witnesses that these were the "rogues" and accept only Asgrow's theory that they were VF-36—because according to its testimony only about 30 percent of the seed planted were "rogues." This we cannot do. The evidence was uncontradicted that VF-36 tomato plants and the fruit thereon differ vastly in appearance from the plants and fruit of the "rogues," and that the two are easily distinguishable, particularly late in their maturity. While it is true that some of plaintiffs' witnesses had been unfamiliar with the VF-36 variety before 1962, the distinctions in the plants had been pointed out to all of them, and in estimating the percentages of late-maturing tomatoes (all the way from 40 percent to 85 percent) there is no doubt that all were well qualified to identify the "rogue" plants and distinguish them from the VF-36 plants. Suffice it to direct attention to the testimony of one of plaintiffs' witnesses, Reuben Solario, field supervisor for the labor contractor who had supervised the picking of 5,000 acres of tomatoes in 1962 of which 500 to 600 acres were VF-36. He stated that 85 percent of the plants in field N-8 were "rogues." Farm Advisor Ray King, a plaintiffs' witness, was also well qualified to distinguish the two types. Significant also is the proof that VF-36 tomatoes (from another source) grown by neighbors of plaintiffs on nearby fields, planted at the same time and cultivated under identical conditions, were harvested on August 16 and 19. Finally, on this point most of plaintiffs' witnesses (including Solario) observed the maturing of the tomato plants throughout the entire season. Asgrow's witnesses' estimates of percentages, insofar as they were based upon observation, were based upon visits to the field no later than in July. (Their other estimates, based upon percentages of "rogues" found in other plants grown by Asgrow from the Milpitas and Oxnard-Ventura stock, would seem to have little, if any, probative value.) The

---

[4]We quote from Asgrow's opening brief: "*Comment*: Mr. Del Carlo's testimony is unequivocal that about 70 % of the plants were late maturing (which supports Asgrow's contention)."

trial court's finding was based upon evidence of "ponderable legal significance."

RE THE LIABILITY OF ASSOCIATED TO PLAINTIFFS, OF RANCH SUPPLY TO ASSOCIATED, AND OF LOCKHART TO RANCH SUPPLY.

The foregoing evidence supports the trial court's findings of liability in the three sales described in the above caption. ■ The court properly compartmentalized that liability into the field of sales law and warranty and not in torts. It is stated by the majority of our Supreme Court (per Chief Justice Traynor) in *Seely* v. *White Motor Co.*, 63 Cal.2d 9, at page 16 [45 Cal.Rptr. 17, 403 P.2d 145] : "Although the rules of warranty frustrate rational compensation for physical injury, they function well in a commercial setting."

■ Warranties are of two kinds, express and implied. Civil Code section 1732 in effect at the time this cause of action arose stated: "Any affirmation of fact or any promise by the seller relating to the goods is an express warranty if the natural tendency of such affirmation or promise is to induce the buyer to purchase the goods, and if the buyer purchases the goods relying thereon. . . ." One of the sections then in effect relating to implied warranties was Civil Code section 1734. It provided in part: "Where there is a contract to sell or a sale of goods by description, there is an implied warranty that the goods shall correspond with the description. . . ." Civil Code section 1735 provided in part that "Where the goods are bought by description from a seller who deals in goods of that description (whether he be the grower or manufacturer or not), there is an implied warranty that the goods shall be of merchantable quality."

Under the facts related above and within the code definitions just quoted there was both an express and an implied warranty in the sale from Associated to plaintiffs. As regards the sales, Ranch Supply to Associated and Lockhart to Ranch Supply, the existence of a warranty which was express is less certain. As regards the three sales discussed under this caption, no question of privity exists. Whether the warranty in these sales is to be considered express or implied[5] (under the facts stated) is immaterial. In either case the purported

[5]As to the definition of implied warranties see, in addition to the code definitions above: 1 Williston on Sales (rev. ed.) section 223, page 571; 1 Witkin, Summary of California Law (1960) page 507, and cases cited. Note, however, 1 Witkin (op. cit.) pages 503-504, wherein it is stated: "Despite some theoretical dispute, however, it is often held that

disclaimers were inadequate to cancel warranty liability. We explain the reasons:

First, as has been noted, in all cases there was a sale by description. The buyer ordered and the seller sold tomato seed purporting to be VF-36. The containers bore that label; the specific qualities of that variety were well known to both buyers and sellers. Implicit in all three sales was the representation that the seed being sold was the variety it was supposed to be. The disclaimers by the intermediate sellers (and final seller, Associated) do not relieve the sellers of liability because (1) they came *after* the contracts were completed—in fact only after the seed had reached the ultimate consumer, the farmer-plaintiffs, and they had been billed therefor; and (2) they were not disclaimers of warranties of merchantability but only of warranties as to use.

Attempts to escape liability for warranties such as those in all of these sales by disclaimers made ''upon or after delivery of the goods, by means of language on an invoice, receipt or similar notice,'' are ineffectual ''unless the buyer assents or he is charged with knowledge of nonwarranty as to the transactions.'' (*India Paint etc. Co.* v. *United Steel Products Corp.*, 123 Cal.App.2d 597, at page 608 [267 P.2d 408], hearing by Supreme Court denied.) (And see cases cited in *India Paint etc. Co.*, at p. 608; see also *Hayman* v. *Shoemake*, 203 Cal.App.2d 140, at p. 157 [21 Cal.Rptr. 519]; and *Newhall etc. Co.* v. *Hogue-Kellog Co.*, 56 Cal.App. 90 [204 P. 562].) Here, as in the cases cited, the disclaimer of each intermediate (and final) seller was on the invoice, was in small print and went unnoticed. (In fact it seems not illogical to observe that the very fact that the disclaimers were uniformly printed in small type in this chain of sales *indicates they were not meant to be seen by the buyers*. As noted above, one of these sellers frankly so admitted.) Nor did any of the buyers either have, or become charged with, knowledge of such nonwarranty when the sale was made. As just stated, they were not supposed to know the sale-chilling fact of disclaimer. The trial court expressly found on substantial evidence against any custom of the trade to impart such knowledge to the customer. (See footnote 3.) █ A unilateral nonwarranty cannot be tacked onto a contract containing a warranty.

a description or designation of goods as of a certain type or quality also constitutes an express warranty of such type or quality. . . .'' (And see the cases cited explaining the quoted statements.)

■ As to the effectiveness of the disclaimers when the goods are unmerchantable, in *Burr* v. *Sherwin Williams Co.*, 42 Cal.2d 682, it is held by our Supreme Court (per Chief Justice Gibson) on pages 694, 695 [258 P.2d 1041], that disclaimers are to be strictly construed against the seller. That case also holds that a statement of nonwarranty as to the *use* of the product does not constitute a disclaimer against "merchantability" within the implied warranty of "merchantable quality" in Civil Code section 1735 (when goods are sold by descriptoin). It is stated by the court (on p. 694): "Many definitions of 'merchantable quality' have been given, but all of them include the basic proposition that the quoted words refer to goods which are reasonably suitable for the ordinary uses and purposes of goods of the general type described by the terms of the sale and which are capable of passing in the market under the name or description by which they were sold. (See *Kenney* v. *Grogan*, 17 Cal.App. 527, 533 [120 P. 433]; Williston on Sales (rev. ed. 1948] § 243, pp. 641-643; Prosser, *Warranty of Merchantable Quality*, 27 Minn.L.Rev. 117, 125-139; 46 Am.Jur. 526-527: 77 C.J.S. 1184-1185.)" Here all the sellers knew that VF-36 was an early-maturing, high-bearing cannery variety of tomato. It must be assumed that all merchants and brokers in the tomato seed industry are well aware that the factor of the progression of maturity to the end that pickers can be maintained and deliveries to the cannery controlled is one vital to the profits of the tomato grower. And they also must have known what the effect of a mixture of 50 percent to 70 percent late-maturing "rogues" in supposedly 100 percent early-maturing VF-36 tomatoes would be. These are circumstances bringing this case within the rule of *Burr* v. *Sherwin Williams Co.*, *supra*, 42 Cal.2d 682. In *Burr* an insecticide spray was sold to farmers as DDTOL, 25 percent emulsifiable. It in fact contained an impurity, a plant hormone known as 2, 4-D. Crop loss resulted. We are unable to distinguish that case from this one.

RE THE LIABILITY OF ASGROW TO LOCKHART AND ITS DIRECT AND PRIMARY LIABILITY TO RANCH SUPPLY AND ASSOCIATED.

The sale from Asgrow to Lockhart presents different factors for our consideration. There was privity but Lockhart knew that Asgrow, notwithstanding its warranty, limited its liability to the price of the seed *and knew this at the time of the sale of the seed.* Effectually, argues Asgrow, there was **an**

express agreement between the parties plus a course of dealing to that effect. Cited are: Civil Code section 1791, providing that such factors negate a liability which would otherwise arise under a sale or contract to sell, and the following cases: *Miller* v. *Germain Seed etc. Co.*, 193 Cal. 62 [222 P. 817, 32 A.L.R. 1215]; *India Paint etc. Co.* v. *United Steel Products Corp.*, 123 Cal.App.2d 597, 608-609 [267 P.2d 408]; *Burr* v. *Sherwin Williams Co.*, 42 Cal.2d 682 [258 P.2d 1041]; *Herrera* v. *Johnston*, 140 Cal.App.2d 822, 825 [295 P.2d 963]; *Hayman* v. *Shoemake*, 203 Cal.App.2d 140 [21 Cal.Rptr. 519]; and *Hoover* v. *Utah Nursery Co.*, 79 Utah 12 [7 P.2d 270]. In some of the cited cases the rule was stated as dicta. The holding was that under the facts there involved there had been no agreement or course of dealing. In the above cases whenever the court found an agreement or course of dealing to exist involving a disclaimer of liability, the facts have shown an *honest* belief by the seller that the goods being sold were what they purported to be. We do not reject the rule of nonwarranty under those conditions. To the authorities which Asgrow cites we can add *Seely* v. *White Motor Co.*, 63 Cal.2d 9 [45 Cal. Rptr. 17, 403 P.2d 145], where the majority opinion, discussing *Santor* v. *A & M Karagheusian, Inc.* [44 N.J. 52 (207 A.2d 305)] (on pp. 17-18) and approving its result (while decrying the strict-liability-in-tort theory upon which it was based), declares (on p. 18): "Had the manufacturer . . . sold it [the rug] 'as is,' or sold it disclaiming any guarantee of quality, there would have been no basis for recovery in that case." When two parties bargain on an equal basis and the buyer is willing to buy a pig in a poke there is no policy of the law to prevent such a transaction.

That was not the case in any of the sales involved here. It was not so in the sale from Asgrow to Lockhart. (There was no "as is" bargain made in *any* sale involved in this case.)

Asgrow is liable to Lockhart upon two grounds: (1) There was an express warranty the seed was VF-36 but there was no agreement between them that Asgrow's warranty was to be drawn back (i.e., limited to a price refund) if and when Asgrow knowingly and deliberately sold a mixed seed as VF-36; nor was there a custom or course of dealing to that effect. (2) Had there been such an agreement it would have been void. ■ As we have shown, Asgrow placed this seed on the market warranting it to be VF-36 *when it knew that it was not VF-36 but an intermixture of VF-36 with "rogues," the percentages of each being unknown.* It held itself out as a firm

which produced tomato seeds "from Asgrow pedigreed seed stocks." It told its customers: "The only 'by-product' connected with Asgrow tomato seed is the extra assurance that your seed will be clean, high-germinating, and free from genetic and mechanical mixtures." Although the evidence is conflicting whether the particular written advertisement quoted was issued before or after this sale, there was no contention that the statement announced any new policy.

■ On the contrary, we remember the testimony of Daniel Nadel of Asgrow that when his company deviated from its policy of placing pedigreed stocks on the market *it bore the risk.* (See p. 91, *supra.*) That statement alone justified the trial court's finding that there was no custom under which this seed manufacturer disclaimed liability.[6]

■ Secondly, such an agreement, had it been made, would have violated the policy of California statutory law. Civil Code section 1668 provides: "All contracts which have for their object, directly or indirectly, to exempt any one from responsibility for his own fraud, or willful injury to the . . . property of another, or violation of law, whether willful or negligent, are against the policy of the law."

Civil Code section 1668 is buttressed by another statement of legislative policy. Agricultural Code section 914 provides in part: "It is unlawful to ship, deliver, transport, or sell any agricultural or vegetable seed within this State: . . . (4) Having a false or misleading labelling, or pertaining to which there has been a false or misleading advertisement." Asgrow argues that Agricultural Code section 914 was not intended to impose an additional civil liability upon a seed manufacturer. We may assume this without so conceding. It was, however, a statute intended for the benefit of purchasers of seed. The express warranty that the seed was VF-36 when it was in fact

---

[6]Asgrow's argument, therefore, contrary to the trial court's finding that even absent an express agreement between buyer and seller there is a trade custom for seed merchants to disclaim or limit liabiliity and that the system is founded upon "sound policy" for the reason "that the purchase price of seed is usually small compared to the value of the crop" and therefore if the seed manufacturer or merchant cannot pro- tect himself by such disclaimers he would find it "hard to survive the litigation that would come to his door" (see *Hoover* v. *Utah Nursery Co., supra,* 7 P.2d 270, 273) has no applicability. Nor do we accept the soundness of such reasoning. It is open to grave doubt whether the farmer's chances of survival exceed those of the seed manufacturer who sells the adulterated seed, and we perceive no reason why the latter should enjoy any court-made position in the field of the law of express and implied warranties more favorable than do other sellers. The codes make no such distinctions.

mixed and Asgrow's knowledge of falsity of that statement creates the liability. Civil Code section 1668 makes the statement of limitation of liability void as against public policy.

Asgrow contends that since the invalidity of the statement was not raised in the lower court it cannot be raised on appeal. We do not accept that statement as sound law. A provision in a contract void as against public policy can be raised at any time. In fact, it is the duty of this court to raise it. (*Lewis & Queen* v. *N. M. Ball Sons,* 48 Cal.2d 141, 147-148 [308 P.2d 713]; *City of Buena Park* v. *Boyar,* 186 Cal.App.2d 61, 66 [8 Cal.Rptr. 674]; *Woodcock* v. *Petrol Corp.,* 48 Cal. App.2d 652, 656 [120 P.2d 889] (hearing by Supreme Court denied); also see *Tunkl* v. *Regents of University of California,* 60 Cal.2d 92, 95, footnote 1 [32 Cal.Rptr. 33, 383 P.2d 441, 6 A.L.R.3d 693].)

Nullity of the disclaimer left extant the warranty that the seed was VF-36 as stated on the containers and as manifested by a sale by description. All parties to this litigation bought the seed as such and in reliance upon the fact that the seed would produce VF-36 plants. Thus, under principles of express warranty, Asgrow was directly and primarily liable not only to Lockhart but also to the intermediate seed merchants and even to plaintiffs.[7] In *Seely* v. *White Motor Co., supra,* 63 Cal.2d 9, the court (on p. 13) after quoting Civil Code section 1732 says: "The statute requires only that plaintiff rely on the warranty. It does not additionally require that he be aware that it was made by the manufacturer instead of the dealer to reach the one who in fact made it."

To summarize this phase of the case: the express warranty by Asgrow was directly carried to all buyers (intermediate and ultimate) both by means of Asgrow's response to an order from a broker and wholesaler and by means of the package description—in other words, it was an express warranty to all who might own, become responsible for the character of the merchandise, or use it. Being an express warranty, its benefits may be claimed by all to whom it was communicated, except plaintiffs (see footnote 7) who bought in reliance upon it. No privity of contract or sale was needed, because there was—as in *Seely* and *Sherwin Williams*—communication of the warranty to the claimant. (See *Seely* v. *White Motor Co., supra,* 63 Cal.2d 9, at p. 14.)

---

[7]Plaintiffs have not appealed from the judgment on their cause of action against Asgrow and that judgment is final. Asgrow's direct liability to plaintiffs therefore cannot now be enforced.

It is urged that the newly-adopted Uniform Commercial Code negates liability in a seed manufacturer under the facts of this case. Since the Commercial Code is inapplicable to these sales, we might avoid answering that argument. As we view it, however, the Commercial Code does not curtail, in any respect we have noted, liability imposed by its predecessor (the Uniform Sales Act) upon sellers for breaches of warranty nor extend their power to disclaim or limit liability for such breaches.[8] The Commercial Code neither expressly nor impliedly repeals Civil Code section 1668, and the direct and primary liability which the law imposes upon Asgrow in this case is based upon the evidence-supported finding of the trial

---

[8]It provides that any affirmation of fact by a seller relating to the goods or description thereof, forming a ''part of the basis of the bargain,'' constitutes an express warranty that the goods shall conform to the affirmation or description. Reliance thereon by the buyer is no longer made an express condition to the creation of such a warranty. (See West's Com. Code Ann., section 2313, subd. (1)(a) and subd. (1)(b), NB, under *California Code Comment* (by John A. Bohn and Charles J. Williams) following said code section. (Comments 2 and 4.) Thus a warranty by description, formerly implied, becomes an express warranty—and reliance is assumed when the warranty is made a ''part of the basis of the bargain.'' As before, by section 2314, subdivision (1), a warranty is implied that the goods are merchantable when the seller is a merchant dealing in that type of goods. The minimum standards of merchantability are defined (in § 2314, subd. (2)) and include a warranty that the goods are adequately ''contained, packaged, and labeled'' and conform to the affirmations of facts on such containers. (§ 2314, subds. (2) (e) and (f).) Also as before, parties dealing on an equal basis may bargain on an ''as if'' basis; disclaimers and limitations of liability are not prohibited (§ 2316) but that section contains limiting language: ''negation or limitation is inoperative to the extent that such construction is unreasonable.'' The code, in its provisions relating to the damages a buyer may recover, recognizes that the agreement may contain provisions limiting a seller's liability but provides: ''Where circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this code.'' ( § 2719, subd. (2).) This has been construed to mean that where the remedy provided by agreement operates to deprive either party of the '' 'substantial value of the bargain' '' it will not be enforced. (West's, *op. cit.*, Comment 2 under said § 2719.)

The California Legislature did not adopt Uniform Commercial Code section 2302. That section invalidated as a matter of law provisions found by the court to be ''unconscionable.'' California Code Comment (West's, *op cit.*, § 2302) points out, however, that express code authorization was and is unnecessary since the California courts, exercising equity powers, have always assumed the unenforceability of contracts which are against public policy. (*Burr* v. *Sherwin Williams Co., supra*, 42 Cal.2d 682.) For further comment on the effects of the code on existing law see Marc A. Franklin, *When Worlds Collide.* . . . 18 Stanford Law Review 974, at page 1012 et seq.; also Mitchel J. Ezer, *The Impact of the Uniform Commercial Code on the California Law of Sales Warranties*, 8 U.C.L.A. Law Review 281, at page 311 et seq.

court that Asgrow placed seed described as VF-36 on the market knowing it not to be that but a mixed variety, intending that it ultimately reach some tomato grower like plaintiffs, intending them to be the test-mice in ascertaining how many ''rogues'' were present. Its plant breeder, Daniel Nadel, when he declared that Asgrow under these facts should bear the risks (see page 91, *supra*) was prophetic.

### THE MEASURE OF DAMAGES WAS PROPER.

The further contention by Asgrow that the trial court applied an improper measure of damages requires very brief notice. Civil Code section 1789, subdivision (6), in effect when this loss occurred provided that ''The measure of damages for breach of warranty is the loss directly and naturally resulting in the ordinary course of events from the breach of warranty.'' Under the facts of this case such loss was the difference between the reasonable market value of the crop as actually produced and the value of the theoretical crop that would have been produced had the warranty been complied with, less in both instances the necessary expenses for raising and selling the crop. (*Hayman* v. *Shoemake, supra,* 203 Cal. App.2d 140, 151.) That was the measure applied by the trial court here. (It is also the measure adopted by the Commercial Code section 2714, subdivision (2).)

''[A] retailer or other seller suffering and paying a judgment against him by an injured person in a warranty action is entitled to indemnity from a manufacturer who sold the product to him with a similar warranty.

''The retailer may similarly be entitled to indemnity from a wholesaler or other middleman who sold the product to him. . . .'' (3 Frumer and Friedman, Products Liability, § 44.30, pp. 718-719.)

That explains our holding as set forth in the following paragraph.

Each of the judgments, plaintiffs against Associated, Associated against Ranch Supply, Ranch Supply against Lockhart, and Lockhart against Asgrow is affirmed; that part of the judgment which denies to Ranch Supply and Associated direct relief against Asgrow is reversed and the court shall enter judgment in favor of said cross-complainants against Asgrow. Each of said judgments shall be for $14,439.32 with interest. When and in the event, however, that Associated shall have satisfied the judgment in favor of plaintiffs and Asgrow shall have satisfied the judgment in favor of Associ-

ated, all judgments shall be satisfied, or in lieu thereof, if Asgrow so elects, a direct payment by it to plaintiffs of the judgment amounts—which we cannot direct (see footnote 7)—will satisfy all judgments. Asgrow shall bear all costs on appeal.

Friedman, J., and Regan, J., concurred.

A petition for a rehearing was denied December 1, 1966, and the opinion was modified to read as printed above. The petition of appellant Asgrow Seed Co. for a hearing by the Supreme Court was denied December 28, 1966.