422 So.2d 948 (1982)
PENNINGTON GRAIN AND SEED, INC., a Georgia Corporation, Appellant,
v.
Edward Howard TUTEN and Producers Corporation of Madison, a Florida Corporation, and John L. Tippette and Producers Corporation of Madison, a Florida Corporation, Appellees.
Nos. AD-323, AD-324.
District Court of Appeal of Florida, First District.
November 9, 1982.
Rehearing Denied December 16, 1982.
George D. Gabel, Jr., Russell W. La Peer and James J. Taylor, Jr., of Wahl & Gabel, Jacksonville, and Clark C. King, Jr., of Lord, Bissell & Brook, Chicago, Ill., for appellant.
Ernest A. Sellers and Andrew J. Decker, III, of Airth, Sellers & Lewis, Live Oak, and Edwin P. Browning, Jr., Madison, for Tuten and Tippette, appellees.
Thomas E. Stone, Madison, for Producers Corp., appellee.
*949 John P. Manwell of Kirkland & Ellis, Washington, D.C., for American Seed Trade Ass'n, amicus curiae.
W. Ross Foote of Trimble, Randow, Percy, Smith, Wilson & Foote, Alexandria, La., for Southern Seedsman Ass'n, amicus curiae.

ON MOTION FOR REHEARING
WIGGINTON, Judge.
Having considered Appellees' Motion for Rehearing, we grant the motion and withdraw the opinion previously filed in this cause, substituting the following decision and opinion in lieu thereof.
This is a consolidated appeal by Pennington Grain and Seed, Inc., of Madison, Georgia, from judgments based on special jury verdicts finding the corporation negligent and liable for breach of both express and implied warranties pertaining to the sale of soybean seeds. We have jurisdiction of this cause pursuant to Section 48.193, Florida Statutes (1981). See generally, Pennington Grain & Seed, Inc. v. Murrow Brothers Seed Co., Inc., 400 So.2d 157 (Fla. 1st DCA 1981).
The record in this cause is voluminous but the pertinent facts are relatively simple. Appellees Edward Howard Tuten and John L. Tippette are farmers living in Madison County, Florida. In February, 1977, at Tippette's farm, they contracted to purchase 600 bushels of soybean seed from appellee Producers Corporation of Madison, Florida, a local warehouse-retailer of grain and seed, expressly specifying to the salesman that the seed be certified Bragg variety and have an 80% germination rate. In April of 1977, Tuten and Tippette went to Producers and paid for the seed. After payment, they were led into the warehouse to where the seed was stored in order to determine their location and to check the tags. Their 600 bushels were part of 700 bushels of soybean seed which were sold to Producers by Pennington Grain and Seed, Inc. of Vidalia, Georgia.
In January of that year, Pennington of Madison entered into a contract with Murrow Brothers Seed Company, Inc., a Georgia producer and processor of seeds, to purchase 10,000 bushels of Georgia certified Bragg soybeans. In March, 1977, Pennington of Madison assigned 700 bushels of that contract to Pennington of Vidalia. Murrow Brothers, as directed by Pennington of Madison, shipped the seed directly to Producers who in turn paid Pennington of Madison (hereinafter Pennington).
Portions of three different lots of the Bragg seed, lots PB76-182, PB76-184 and PB76-188, were those purchased by Tuten and Tippette in April. Each seed bag bore a tag reflecting a germination rate of 80%, as required by Sections 578.09(2) and 578.13(1)(b), Florida Statutes (1977), and a "warranty" stating:
PENNINGTON SEED, INC. (Pennington) warrants to the extent of the purchase price only, that the seed in this container are as described on the label within recognized tolerances. Should this not be the case and proof is given, Pennington's extent of liability shall be limited to the purchase price only.
PENNINGTON MAKES NO OTHER OR FURTHER WARRANTY EITHER EXPRESS OR IMPLIED AS TO THE MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OF THE SEED IN THIS CONTAINER.
Pennington shall not be liable for damages as a result of the use of these seed, either through direct or consequential damages or crop failure.
DO NOT PLANT THESE SEED SHOULD THIS WARRANTY BE UNACCEPTABLE, BUT RATHER RETURN THE SEED TO PENNINGTON WITHIN 10 DAYS OF PURCHASE FOR A REFUND OF THE PURCHASE PRICE.
Following sound and accepted agricultural practices, Tuten and Tippette planted the Pennington seed in irrigated systems in May. After each planted his first 160 acres both observed a poor crop stand with most of the seed failing to germinate, sprout or grow out of the ground as normal seedlings. Both farmers planted a second system, eliminating possible causes of the failure to *950 obtain a first stand, which system also failed to produce a crop stand.
Tuten subsequently planted 30 acres of non-Pennington soybean seed purchased from Cherry Farms on his mother's land, following the same agricultural practices used on his initial 160-acre system. The first few rows planted with this seed produced a good crop stand. The remaining rows of the second system planted with Pennington seed again failed to produce a crop stand. Tuten harvested only 10 bushels per acre off the Pennington field; he harvested 30 bushels per acre off his mother's non-Pennington field.
Tippette also changed his agricultural program by planting 40 acres of non-Pennington seed on a neighboring farmer's field without irrigation. This field likewise produced a good crop stand and yield. The Pennington seed resulted in a yield of five bushels per acre while carry over seed from 1976 that had also been planted resulted in a yield of 20 to 25 bushels per acre.
A neighboring farmer, concerned by the poor crop stand he observed on Tuten's and Tippette's land, dug into the ground and observed that the seeds were simply not sprouting. Tuten and Tippette brought their complaints before the Florida Seed Arbitration Counsel. Subsequent germination tests performed by the Florida Seed Laboratory on Lot PB76-182 showed the germination rate had dropped to 69%.
Tuten and Tippette thereafter brought this suit alleging damages for the loss of their 1977 soybean crops as a result of alleged defective seed sold and furnished by Pennington and its Florida dealer, Producers. Their actions were grounded on theories of negligence, breach of implied warranties and breach of an express warranty. Judgments were entered against Pennington and Producers upon jury verdicts for appellee Tuten in the amount of $69,044.16 and for appellee Tippette in the amount of $92,050.40. Judgment was also entered for Producers against Pennington on Producer's cross-claim for indemnity. Pennington's subsequent motions for a directed verdict, or in the alternative, for a new trial were denied. This appeal followed.
Appellees' claims of negligence were twofold. First, they claimed Pennington was negligent in failing to have the soybean seed "vigor" tested in addition to the germination tests that were performed in accordance with the Florida Seed Law. Second, they claimed Pennington was negligent in failing to warn or in some other way correct improper storage conditions in the warehouse owned and operated by Producers, which conditions allegedly contributed to a deterioration of the seed. Regarding this latter claim, we find the complaints have failed to state a cause of action. Pennington had no duty to warn of the alleged improper storage conditions because there is no such duty with respect to a product, such as soybean seed, which is, as a matter of fact, not dangerous. See generally 63 Am.Jur.2d, Products Liability, § 50.
As to the first claim, the record evidence fails to establish a duty on the part of Pennington to vigor test the soybean seed. Presently, the only test required of seed companies on either the state or federal level is the germination test. In this regard, the Florida Seed Law, Section 578.09 et seq. (1981), provides that each container of agricultural seed sold in this state shall bear a label containing requisite information including the germination rate. The Florida Department of Agriculture and Consumer Services has set the acceptable germination rate at 80% and does not require that a vigor test be performed; nor is there positive evidence in the record establishing a custom in the seed industry of vigor testing. Indeed, the evidence shows that vigor tests vary widely in type and result.
It is not within the province of the courts to legislate new standards in the industry. Considering the dearth of evidence as to an allegedly entrenched industry custom of vigor testing seed, we cannot say that Pennington was required by law to perform such tests. Absent such a duty, we find Pennington was not negligent in failing to vigor test the seed, however, our conclusion *951 on that singular point is not dispositive of this appeal.
Appellees' claim against Pennington based on breach of warranties is also two-fold. First, appellees argue that Pennington breached its implied warranties of merchantability and fitness. Second, appellees contend that the seed tag bearing a germination rate of 80% created an express warranty, also breached by Pennington. We agree that Pennington breached the implied warranties.
Soybean seed that is incapable of producing healthy plants is not fit for its intended use, and the record evidence in this case supports the jury's verdict that the seed was defective. Therefore, it is immaterial whether the seed tags may have created an express warranty, because Pennington breached its implied warranties of merchantability and fitness.
We reject Pennington's theory based on Sections 672.316 and 672.719, that the "warranty" printed on each bag disclaimed any implied warranties or limited the recoverable damages to the value of the seeds. We find the disclaimer ineffective under the circumstances of this case because it amounted to a post-contract, unbargained-for unilateral attempt to limit Pennington's obligations under the contract. We agree in principle with the Kansas Supreme Court which, upon examining that state's statute similar to Florida's Section 672.316, stated:
The very purpose of the statutory requirement is that any limitation be brought to the attention of the buyer at the time the contract is made. An attempted limitation at the time of delivery long after a contract of purchase is signed does not accomplish this purpose, being a unilateral attempt of a party to limit its obligations.
Christopher and Son, Inc. v. Kansas Paint & Color Company, Inc., 523 P.2d 709, 215 Kan. 185 (1974). See Mack Trucks of Arkansas, Inc., et al. v. Jet Asphalt & Rock Company, 246 Ark. 101, 437 S.W.2d 459 (1969). See also, Knipp v. Weinbaum, 351 So.2d 1081, 1084-85 (Fla. 3d DCA 1977).
We would nevertheless recognize the disclaimer of other warranties as effective had the farmers assented to it, Pfizer Genetics, Inc. v. Williams Management Co., 204 Neb. 151, 281 N.W.2d 536 (1979), or if the farmers knew of such non-warranty at the time the sale was made, with proof of knowledge being either direct or indirect through evidence of trade custom or course of dealing.[1]See Klein, et al. v. Asgrow Seed Company, et al., 246 Cal. App.2d 87, 54 Cal. Rptr. 609 (3d DCA 1966); Section 672.316(3)(d). Similarly, we would agree with Pennington that Section 672.719(1)(b) permits a limitation of damages if such limitation was part of the "agreement" and had been "expressly agreed to be exclusive," as provided in that section.[2]
Here, however, when Pennington requested the jury be instructed that liability and damages should be limited by the terms of the "warranty" attached to the bags, the judge properly rejected that instruction because *952 it was not predicated upon the jury finding the farmers had knowledge of the disclaimer of warranty or that they had expressly agreed to the limitation of damages. Without a finding of knowledge or express agreement Pennington did not establish that its label effectively disclaimed implied warranties or limited damages to less than that provided by the Uniform Commercial Code in Sections 672.714 or 672.715.
Because the appellant has not demonstrated that the jury's assessment of damages deviated from those statutes or that the finding of liability was erroneous, the verdict and judgment will remain undisturbed.
JOANOS, J., and OWEN, WILLIAM C., Jr., Associate Judge, concur.
NOTES
[1] The trial court properly granted appellees' motion for directed verdict against Pennington's fourth affirmative defense setting forth the disclaimer, as there was no showing made by Pennington that selling seed in Florida and Georgia subject to a disclaimer was a custom in the trade, so that the appellees might be charged with constructive knowledge of it.
[2] It is not contested in the record that Producer's seed salesman had no knowledge of Pennington's disclaimer and limitation of liability that appears on the seed bags. There was no testimony establishing that Pennington required its dealers to notify the purchaser of the printed "warranty." Consequently, he had never brought that condition to the attention of these appellees or his other customers and it did not appear on the purchase documents at the time of the sale or thereafter. Cf. Bickett v. W.R. Grace & Co., 12 UCC 629 (W.D.Ky. 1972) (in which implied warranties were limited through trade custom and the parties' course of dealing); and also, Billings v. Joseph Harris Co., Inc., 290 N.C. 502, 226 S.E.2d 321 (1976) (in which the farmers signed the contract containing the limitation.) We do not now reach the issue of whether Pennington's attempted disclaimer and limitation of remedies would have been valid had the farmers seen the "warranty" after purchase, for there is also no evidence in the record clearly establishing that the farmers were ever aware of the "warranty," either before or after they purchased the seed.