Traveler's Insurance v. DeMarle, No. 826-99 Cncv (Katz, J., Sept. 22, 2003)


[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]


STATE OF VERMONT                         SUPERIOR COURT
Chittenden County, ss.:                  Docket No. 826-99 CnCv


TRAVELERS INS. CO'S.


V.


DEMARLE, INC. U.S.A.


**ENTRY**


Greyston Bakery and their insurance company Travelers (hereinafter Bakery) seek compensation from the defendant Demarle, Inc. based on four counts: 1) Products Liability, 2) Warranty, 3) Negligence, and 4) Indemnity and Compensation. Demarle seeks to dismiss all claims on a motion for summary judgment.

Greyston Bakery is a New York Corporation that manufacturers baked goods. These goods are not sold through retail but to other companies that incorporate them into their products or repackage them as

their "house" brand.  Bakery bakes several hundred pounds of brownies each year for their single largest customer, Ben & Jerry's Ice Cream, which uses them in its New York Super Fudge Chunk Brownie ice cream and yogurt.  In the beginning of October 1997, Quality Assurance at Ben & Jerry's noticed small fibers in the brownies from Bakery.  Ben & Jerry's notified Bakery about the problem.  Further sampling led to more fibers, and Ben & Jerry's decided to dispose of 47,000 gallons of potentially contaminated brownie ice cream and yogurt.  In response, Bakery inspected its facilities and tools for a potential source of the fibers.  Bakery concluded that Silpats, a silicon-based baking pad used to keep the brownies from sticking to the oven pans, were responsible.

Between October 1 and 6, 1997, Bakery disposed of its entire stock of Silpats including every Silpat that had been in production the previous month.  Bakery did not mark or in any way take note of the age, number, or individual condition of any Silpats at that time.  On October 22, 1997, Bakery informed Demarle, Inc. of Ben & Jerry's claim. Demarle, Inc. is a New Jersey-based company that is the sole distributor of Silpats in the United States and is owned by Ets. Guy Demarle, SA, their French manufacturer and designer.

Demarle began selling Silpats to Bakery in August of 1993 when Bakery bought an initial 650 Silpats.  Bakery used the Silpats in production and purchased additional Silpats as needed.  In 1995, Bakery purchased 100 Silpats in February, and again in March, April, May, and August.  In 1996, Bakery purchased 60 Silpats in June and 150 in September and October.  Bakery's ninth and final purchase of Silpats before September 1997 occurred in January 1997 with 250 purchased.  Over a four year period Bakery purchased over 1750 Silpats from Demarle.

Bakery, at any given time between August 1993 and October 1997, had 300 to 400 Silpats in the production process. Bakery kept between 100 and 200 Silpats in reserve for ones that became damaged or worn-out. This number fluctuated as reserve Silpats were put into production. Steven Spencer, a Bakery employee who oversaw inventory, would re-order once the Silpat reserve dropped to 25. The new Silpats not immediately drafted into use would refill the reserve supply. Silpats are made of tightly woven, silicon covered fibers. Their size and texture give them the appearance and feel of rubberized place-mats. They are heat tolerant and provide a non-stick baking surface between food and tray. Silpats by their nature wear out. The average lifespan of a Silpat is between 1000 and 2000 uses. This is dependant on a number of factors including care and maintenance, frequency of use, degree of heat exposure, and type of goods being baked. Each use of a Silpat wears away at the silicon coating. Eventually in normal use, the silicon will wear off a Silpat causing the fibers to fray, exposing them to the food product. To this end, each Silpat is marked with a manufacturer's date code. Demarle also tells its customers to discard a Silpat if baking material begins to stick. With the initial sale, Demarle provided Bakery with care and maintenance information. It did not advise Bakery about tracking the age or use of Silpats or any potential effects of wear.

Bakery was aware of the limited lifespan of Silpats and had implemented an employee monitoring program to spot worn or frayed mats in production. Apart from this program, however, Bakery did not monitor the age or number of uses of each Silpat. After its initial purchase, a Silpat would enter production only as a replacement for a damaged or worn-out Silpat and would stay in production until visual signs of wear were noticed. During this time period, Bakery was also using other non-stick baking sheets purchased through other distributors. Deborah H. Gaynor, Ph.D.,

was hired by Bakery in 1998 to determine the source of the fibers in the contaminated brownies. She concluded using an electron microscope that they came from Silpats.

After the first purchase of Silpats in 1993, Demarle sent an invoice memorializing delivery. The invoice contained a record of the transaction and no additional terms concerning warranty or contract. Following the second purchase, January 1995, Demarle began sending a different form invoice. At the bottom of this invoice's front is the phrase in all capital letters, "PLEASE CAREFULLY READ OUR TERMS ON REVERSE SIDE." On the back of the invoice sheet were twenty paragraphs entitled "TERMS AND CONDITIONS OF SALE." Paragraph 15, in particular, was printed in all capitals and has the subheading "WARRANTIES." This paragraph disclaimed all warranties, especially the "WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE."

At no point did Bakery or one of its agents explicitly agree to the additional terms contained within the invoice, and at no time did Demarle refuse to deliver the Silpats based on any lack of acceptance. In fact, Demarle never discussed the terms on the invoice with Bakery.

In August 1998, Bakery and Travelers paid Ben & Jerry's for the price of the 47,000 gallons of ice cream as part of a settlement agreement. In return Ben & Jerry's gave up any claims it had against Bakery. Ben & Jerry's also turned over any claims it might have had against Demarle to Travelers and Bakery.

## DISCUSSION

The defendants have made this motion for summary judgment and bear the burden of demonstrating there are no issues of material facts and that they are entitled to judgment as a matter of law. Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986). Plaintiffs, however, still carry the ultimate burden of persuasion on each issue, and "summary judgment will be granted if, after an adequate time for discovery, a party fails to make a showing sufficient to establish an essential element of the case on which the party will bear the burden of proof at trial." Gallipo v. City of Rutland, 163 Vt. 83, 86 (1994). A summary judgment motion in a case such as this is intended to "smoke out" the facts to see if anything remains to be tried. Donnelly v. Guion, 467 F.2d 290, 293 (2d Cir. 1972).

## Disclaimer of Warranty

Defendants argue that they have effectively disclaimed any warranties through the disclaimer in their invoice. Defendants point out that Bakery received the exact same invoice with the exact same disclaimer on each and every purchase. Whether or not Bakery read or explicitly accepted this disclaimer and accompanying terms, they became part of the underlying bargain by its tacit acceptance demonstrated by the successive re-orders.

We reject Demarle's argument. Case law limits the applicability of warranty disclaimers. As a general rule, disclaimers are not favored under the law. Hartwig Farms, Inc. v. Pacific Gamble Robinson Co., 625 P.2d 171, 173 (Wash. 1981); Henningsen v. Bloomfield Motors, 161 A.2d 69, 77–78 (N.J. 1960). Under 9A V.S.A. § 2-316 a seller may disclaim a warranty so long as it is in writing and conspicuous. Such disclaimers, however, must be part of the contract. Lutz Farms v.Asgrow Seed Co., 948 F.2d 638 (10th Cir. 1991) (emphasizing that express 2-313 warranties must

be disclaimed with specificity in the contract); <u>Bowdoin v. Showell Growers, Inc.</u>, 817 F.2d 1543 (11th Cir. 1987). When disclaimers are inserted after the contract, they do not become part of the contract, even through a course of dealing. <u>Hartwig</u>, 625 P.2d at 174; <u>Pennington Grain & Seed, Inc. v. Tuten</u>, 422 So. 2d 948 (Fla. App. 1982). Certain circumstance may alter the application of this principle where the invoice contains critical instructions or have been sent over the course of an extended relationship. <u>See</u> <u>Tolmie Farms, Inc. v. Stauffer Chemical Co., Inc.</u>, 862 P.2d 299 (Idaho 1992) (enforcing a warranty disclaimer that accompanied 160 invoices and was contained in critical instructions for pesticide application). Such circumstances, however, do not exist in this case.

Demarle's disclaimer was printed on its invoices and were sent either with or after each Silpat delivery. Demarle never conditioned receipt of goods on accepting the terms contained in the invoice and never requested Bakery to acknowledge the terms. While this may reward Bakery for not reading the invoice, it more properly prohibits Demarle from relying on an unbargained-for contract term that has such a material effect on the natural and statutory contract rights of its customer. 9A V.S.A. § 2-207. As a matter of law Demarle's disclaimer is ineffective and cannot prevent Bakery from pursuing its rights under warranty.

### Causation of Silpat Fibers

Demarle points out that Bakery cannot actually prove that Demarle's Silpats were manufactured improperly or failed during their "lifespan" in such a way that led to fibers in the brownies.

By their very nature, Silpats are disposable items. If used properly and maintained correctly, a Silpat will still fray and shed fibers after a

certain number of uses. Since Bakery is arguing that the Silpats were defective, it must ultimately prove that, through no fault of its own, the Silpats began shedding fibers into the brownies before the reasonable end of their lifespan. To do this Bakery must link the fibers in the Ben & Jerry's brownies to Silpats that were less than one year old or under a 1000 uses. Bakery, with all benefit of reasonable inference, Murray v. White, 155 Vt. 621, 628 (1991) (interpreting Rule 56 (c), V.R.C.P.), cannot demonstrate that this is anything more than a mere possibility. The factual complications are three: 1) Plaintiff knew the mats would not last more than one year and had a "system" to detect and remove worn-out mats; 2) Plaintiff's system was one of mere casual, unsystematic visual inspection, which did not track the age or use of any given individual mat in production; 3) Plaintiff destroyed all of the mats in both production and reserve, right after Ben & Jerry's complaint, so that neither plaintiff nor defendant could thereafter identify which mats were in production, their condition, or age.

Despite this situation, Bakery contends that it can demonstrate this link between brownie fibers and the Silpats less than one year old as their source. Bakery begins with its expert witness who can testify that the fibers in the brownies were from Silpats and Silpats alone. This, at least for the purposes of summary judgment, isolates the Silpat source from other mats in production. The question is then narrowed to whether the fiber comes from new Silpats or older Silpats still in production. Here the plaintiff's evidence falters. To link the fibers to the new Silpat, does Bakery say that its employees tracked the age or use of the Silpats? Does Bakery have a record of rotating out all of the old Silpats and replacing them with new ones? Does Bakery have any mats to offer that are both frayed and less than one year old? The answer to all is "no." Even under the most liberal of inferences, Bakery and its employees cannot offer any personal

knowledge linking a fiber or fray to the still-warranted mats. By the very nature of Bakery's hit-or-miss replacement system such knowledge is precluded. More akin to natural selection, Bakery's insertion of new mats was based on a matter of need and depended on sporadic visual inspection. While this system may have seemed to serve well for the four years prior to Ben & Jerry's discovery, it ultimately failed to pickup the fibers which Bakery inherently concedes slipped from Silpat to product. Bakery's contention is finally undermined by the lack of Silpats from production for it to use as direct evidence.

Bakery acknowledges this large gap of personal knowledge, the lack of any systematic tracking system for Silpats in production, and the lack of the actual Silpats involved for evidence. What Bakery argues is that it deserves a mathematical inference based on circumstantial evidence. In brief, Bakery points out that it frequently rotated Silpats out of production and that its prior purchasing record is consistent with this practice. Further, the purchase record corresponds to Demarle's statement that Silpats will last between 1000 and 2000 bakes. Bakery suggests that since it bought 550 Silpats in the year prior to September 1997 and put a number of them into production at the end of August 1997, the Silpats responsible for shedding their fibers were new.

Bakery's logic is flawed because it rests upon the assumed premise that all of the Silpats in production in September 1997 were new. While this is theoretically possible, there is simply no foundation for inferring this from the facts. The inference simply does not reach far enough. To argue that most Silpats in production use were new is insufficient. Even arguing that almost all those in use were is insufficient. For the fraying few still in use beyond warranty become the more likely candidates because of age or overuse to produce the fiber-laden brownies. Bakery cannot demonstrate

that the Silpats were regularly rotated in any consistent manner that would ensure every Silpat on the verge of fraying was replaced. Their system makes it equally likely that a 1993 Silpat would still be in production simply because it had not shed its fibers in a detectable manner and thereby been removed. Without this premise, the flaw in the plaintiff's argument becomes clear through the following syllogism:

- All Silpats will not shed fibers into brownies unless they are old or defective.
- Some of the Silpats in production were less than a year old when the fibers went into the brownies.
- Therefore, the new Silpats were defective.

Bakery's deduction is improper because it connects the defect with the Silpats in a manner that is not covered by the evidence. If the new Silpats shed their fibers they would, by deduction, have to be defective, but the fact that only some Silpats in production were new does not allow us to put the new Silpats into the category of defective. See Kristen K. Robbins, Paradigm Lost: Recapturing Classical Rhetoric to Validate Legal Reasoning, 27 Vt. L. Rev. 483, 493–94 (2003).

Bakery's best argument is a mere possibility, which, given Bakery's burden of proof, cannot survive summary judgment. Smith v. Parrott, 2003 Vt. 64 ¶ 6. That burden is to prove that Silpats still under warranty actually caused fibers to be released in Ben & Jerry's brownies. Without a link between the brownie fibers and new Silpats, Bakery cannot prove causation. When the proof in the case, because of the system on the factory floor, does not permit the conclusion that beyond-warranty Silpats were removed from service, that proof fails.

Summary Judgment is particularly appropriate in this case because there are a number of alternative theories of causation available ranging from an outright failure of the product to employee misuse to a flaw in the baking process. In light of the numerous possibilities, the plaintiff's evidence must create a probability since anything less would force a jury to speculate on proximate cause. Parrott, 2003 Vt. 64 ¶ 6; Ruiz v. Whirpool, Inc., 12 F.3d 510, 513 (5th Cir. 1994); Aerospatiale Helicopter Corp. v. Universal Health Service, Inc., 778 SW2d 492, 497 (Tex. App. 1989), cert. denied 498 U.S. 854 ( 1990) ("Where a finding of proximate causation could only be reached by indulging in speculation and the stacking of one inference upon another, such finding is against the great weight and preponderance of the evidence."); Marder v. G.D. Searle & Co., 630 F. Supp.1087, 1089 (D.Md. 1986) ("This emphasis, where causation is dispositive, upon 'probability,' 'reasonable probability,' 'substantial probability' rather than mere 'possibility' as the proper test simply bespeaks the special danger that in a matter so generally incapable of certain proof jury decision will be on the basis of sheer speculation . . . ."). This need for causation is equally applicable to Bakery's theory of warranty. See James White & Robert Summers, Handbook of the Law Under the Uniform Commercial Code § 9-9 (3d ed. 1988) (discussing plaintiff's need for proof of causation to advance warranty claims). Lacking proof that the Silpats either failed to be marketable or conform to the "express promise" of 1000 bakes, Bakery's warranty claim cannot survive.

## Negligence and the Economic Loss Rule

As to Bakery's claim of negligence, it admits that the economic loss rule precludes the issue regarding its own claim. Instead, Bakery argues that it is asserting Ben & Jerry's negligence claim against Demarle.

Roughly, this claim is that Demarle knew Bakery supplied brownies to Ben & Jerry's, therefore, it owed a duty to Ben & Jerry's not to manufacture a defective baking mat because Ben & Jerry's would be the ultimate recipient of defective brownies. Bakery had to cover Ben & Jerry's loss and now seeks to recover through indemnity and contribution from Demarle, "the Tortfeasor." Despite an argument couched in tort law duty terminology, Bakery's claim is little more than an attempted end-run around the rule of economic loss. Ben & Jerry's is not consumer of Bakery's brownies and its "damage" and loss were economic in their form and nature. Despite the lack of a direct contractual relationship, Demarle's relationship to Ben & Jerry's is primarily through contract. That is business to business to business. The purpose of the economic loss rule is to separate the world of tort, that is personal injury and property damage, from strictly economic loss, the loss of profits and inventory. Our Court has explicitly adopted this view and reasoning. Paquette v. Deere & Co., 168 Vt. 258, 260–63 (1998) (citing East River Steamship Corp. v. Transamerica Delaval, Inc., 476 U.S. 858 (1986)). To enforce tort negligence damages against Demarle by Ben & Jerry's, or in this case their contractual surrogates, Bakery and Travelers, would confuse the concept of consumer protection oft enunciated in tort with the commercial protections of warranty. Springfield Hydroelectric Co. v. Copp, 172 Vt. 311, 315 (2001) (extending the economic loss rule to claims of negligence); Board of Education of City of Chicago v. A, C, & S, Inc., 546 N.E.2d 580, 586 (Ill. 1989) ("Damage resulting from deterioration, internal breakage or other nonaccidental causes most likely invokes contract law."). Ben & Jerry's claim of negligence is better left to warranty and the U.C.C. which protect the underlying economic relationships in this case by giving parties a clear method to contract for damages and a greater level of predictability. See generally William K. Jones, Product Defect Causing Commercial Loss: The Ascendency of Contract Over Tort, 44 U. Miami L. Rev. 731 (1990) (advocating the

reduction of tort applications in commercial claims).  For this reason, we find Bakery's negligence claims unpersuasive.

Finally, Bakery and Travelers argue for indemnity and contribution. This claim, however, is dependant upon the prior causes of action that we have addressed and must be likewise denied.

For the foregoing reasons.  Defendant's motion for summary judgment is granted in full; plaintiffs have failed to prove their claims and they must be dismissed.

Dated at Burlington, Vermont_____, 20_____.


_____
Judge