0519

GOLD KIST, INC., d/b/a Farmers Mutual Exchange, Appellant, v. The
CITIZENS AND SOUTHERN NATIONAL BANK OF SOUTH CARO-
LINA, as Executors of The Estate of J. C. Lanham, Respondent.

(333 S. E. (2d) 67)

Court of Appeals

*E. Ellison Walker,* of *Prioleau & Walker,* Columbia, *for appellant.*

*Daphne D. Sipes,* San Antonio, Tex, *for respondent.*

Heard Feb. 25, 1985.

Decided July 8, 1985.

CURETON, Judge:

Appellant Gold Kist brought suit against respondent Citizens & Southern National Bank, executor of the Estate of J. C. Lanham, for $38,885 owed on an open account for agricultural and farming products. The Lanham estate counterclaimed for actual and punitive damages arising out of fraud and breach of express and implied warranties in the sale of corn seed. The jury returned a verdict of $2,500 for Gold Kist and it appeals. We affirm.

The facts giving rise to the dispute are fairly simple. The decedent's two sons, James and Butler Lanham, operated the decedent's 2,000-acre farm following his death. In the fall of 1978, they had occasion to discuss their 1979 corn crop needs with representatives of Gold Kist, a retail supply store. Among other recommendations, Gold Kist advised the Lanhams to plant Coker-77 corn seed for silage to feed the Lanhams' dairy cows. Unquestionably, Gold Kist represented to the Lanhams that the Coker-77 variety of corn

seed would produce a high tonnage of corn silage per acre, and would give the Lanhams the maximum amount of feed they could expect to harvest from any other variety of corn seed.

In February 1979, the Lanhams purchased approximately twenty-five bags of Coker-77 corn seed from Gold Kist. They planted the seed using accepted and prudent farming methods. Nevertheless, they got a poor stand of corn. The entire 88.9-acre field of Coker-77 corn yielded only fifty tons of silage (approximately 40-45 bushels per acre) instead of the anticipated yield of 2,235 tons. The Lanhams' yield on their other corn acreage planted with a different variety of seed was above average.

Upon the Lanhams' refusal to pay their account, Gold Kist initiated this action to recover the amount owed. The Lanhams defended the action on the ground the corn seed was defective. They also counterclaimed for actual and punitive damages of $200,000 based on (1) breach of express warranty that the Coker-77 seed would produce healthy plants or 140 bushels of feed per acre, (2) breach of implied warranty of merchantability, (3) breach of implied warranty of fitness for a particular purpose, and (4) fraudulent misrepresentation that the seed was adequately tested and would yield a normal harvest. In reply, Gold Kist alleged that it had disclaimed the warranties alleged and limited its liability to the purchase price of the seed based on a disclaimer printed on the bags of corn seed delivered to the Lanhams.

At appropriate stages of the trial, Gold Kist moved for the entry of judgment in its favor as a matter of law. The motions were denied and the case was submitted to the jury on all of the causes alleged. The jury was instructed it could return a general verdict for either Gold Kist or the Lanhams. It returned a verdict for Gold Kist for $2,500. Gold Kist's motion for judgment notwithstanding the verdict was also denied.

Gold Kist has preserved for appellate review by appropriate objection or motion, exception and argument, the questions (1) whether the trial court erred in denying Gold Kist's motions for a directed verdict and judgment *n.o.v.* (a) on its action on the account, (b) against the Lanhams on their actions for breach of implied warran-

ties of merchantability and fitness for a particular purpose, and (c) against the Lanhams on their action for fraud, and (2) whether the court erred in excluding the deposition of a witness for Gold Kist.[1]

## I. Account

Gold Kist first contends the court erred in failing to direct a verdict for it on its action of the account for sum claimed less the purchase price of corn seed. It maintains that the Lanhams' sole defense to liability on the account was the defectiveness of the seed. Gold Kist argues that assuming the seed was defective, the Lanhams' maximum recovery was limited to the purchase price of the seed. Gold Kist therefore contends that as a matter of law the court should have directed the jury to return a verdict of no less than the amount claimed on the account minus the purchase price of the seed, assuming the jury found the seed defective.

Central to acceptance of this contention is the validity of Gold Kist's disclaimer which included an exclusion of warranties and a limitation of remedies.[2] If the disclaimer fails, as the Lanhams contend it should, they are entitled to recover any damages proximately caused by the breach. We find evidence which reasonably supports the jury's implicit finding (upon proper instructions) that the

---

[1] Gold Kist noted several other exceptions in the record. The exceptions either were not raised in the trial court or were not argued by Gold Kist in its brief and are therefore deemed abandoned.

[2] The disclaimer, printed on the back of the seed bag, provided in relevant part:

NOTICE TO BUYER — LIMITATION OF WARRANTY

Seller warrants that the seed sold by it conforms to the descriptions on the label.... This warranty excludes and is in lieu of all other warranties, expressed or implied, including any warranty of merchantability and of fitness for a particular purpose which are hereby expressly disclaimed....

[I]t is expressly agreed that the Seller's liability to the Buyer ... shall be limited solely to the amount of the purchase price of the seed. The remedy provided herein shall be the exclusive and sole remedy of the Buyer for any such loss. In no event shall the Seller be liable for any consequential or incidental damages....

Acceptance of the seeds ... constitutes acknowledgement that the limitations and disclaimers herein set forth are conditions of the sale and constitute the entire agreement between the parties regarding warranty or other liabilities and the remedy therefor.

disclaimer is invalid because it amounts to a post-contract, unbargained-for unilaternal attempt by Gold Kist to limit its obligations under the contract.

According to the prevailing interpretation of the Uniform Commercial Code, a disclaimer printed on a label or other document and given to the buyer at the time of delivery of the goods is ineffective if a bargain has already arisen. *Pennington Grain and Seed, Inc. v. Tuten*, 422 So. (2d) 948 (Fla. App. 1982) (disclaimer on soybean seed bags delivered after purchase invalid); *Pfizer Genetics, Inc. v. Williams Management Co.*, 204 Neb. 151, 281 N.W. (2d) 536 (1979) (disclaimer on corn seed bag and in invoice delivered subsequent to written contract of sale ineffective); *Hartwig Farms, Inc. v. Pacific Gamble Robinson Co.*, 28 Wash. App. 539, 625 P. (2d) 171 (1981) (disclaimer in invoice delivered with seed potatoes following oral contract invalid); *Christopher & Son, Inc. v. Kansas Paint & Color Co.*, 215 Kan. 185, 523 P. (2d) 709 (1974) (disclaimer in invoices accompanying delivery of paint ineffective); *Klein v. Asgrow Seed Co.*, 246 Cal. App. (2d) 87, 54 Cal. Rptr. 609 (1966) (disclaimer in invoices and on containers in which seed delivered ineffective); *Willoughby v. Ciba-Geigy Corp.*, 601 S. W. (2d) 385 (Tex. Civ. App. 1979) (disclaimer on container of herbicide ineffective where never brought to buyer's attention).

The evidence in this case reveals that the bargain or agreement between the parties occurred prior to the delivery of the seed bags with the disclaimer. The Lanhams entered into an oral contract to purchase a quantity of Coker-77 corn seed. There is no evidence that the disclaimer was brought to the Lanhams' attention at that time. Gold Kist subsequently delivered the bags to the Lanham farm. Clearly the evidence supports the conclusion that the disclaimer was not a part of the bargain between the parties.

Of course we recognize that Section 36-2-209 of the South Carolina Code of Laws of 1976[3] indicates that a disclaimer made after the closing of the sale can be made a binding part of the contract if the parties agree to

---

[3] Section 36-2-209(1) provides that "[a]n agreement modifying a contract within this chapter needs no consideration to be binding."

the modification. *See* White and Summers, *Uniform Commercial Code,* p. 446 ( (2d) ed. 1980). An agreement to modify can only be found, however, if the evidence reveals that the buyer acquired knowledge of the offered modification and had an opportunity to object to it. *Pennington Grain and Seed, Inc. v. Tuten, supra; Pfizer Genetics, Inc. v. Williams Management Co., supra.* Here, there is no evidence that the Lanhams ever learned of or accepted the terms of the disclaimer prior to the litigation in issue.

Gold Kist relies on *Hill v. BASF Wyandotte Corp.,* 696 F. (2d) 287 (4th Cir. 1982), a case interpreting South Carolina UCC provisions, which holds that a disclaimer containing a merger or integration clause and appearing on the label of a container of herbicide effectively excludes prior oral express warranties and limits the buyer's remedies to those stated in the disclaimer. In *Hill,* however, the Court specifically found (without explanation) that the disclaimer was not a post-contract attempt to limit liability. The opinion reveals that the buyer read the disclaimer before using the herbicide and, although invited to return the product if the terms were unacceptable, retained and used it. We are unable to determine upon what basis the Court held the disclaimer to be part of the bargain between the parties and therefore decline to follow the decision. *See Hill v. BASF Wyandotte Corp.,* 280 S. C. 174, 311 S. E. (2d) 734 (1984).

We hold the court did not err in denying Gold Kist a ▮▮ directed verdict on its action on the account minus the purchase price of the corn seed. Based on the evidence, the question of whether the disclaimer was a part of the agreement between the parties was a jury question. Likewise, based on the jury's findings regarding the disclaimer, the issue of the Lanhams' liability on the account was also a jury question.

## II. Implied Warranties

Gold Kist also assigns as error the denial of its motion for a directed verdict and judgment *n.o.v.* against the Lanhams on their actions for breach of implied warranties of merchantability and fitness for a particular purpose. Gold Kist contends that the Lanhams were bound

by the disclaimer to the single express warranty contained in the disclaimer. We find no merit in the contention based upon our prior holding that the disclaimer was ineffective to exclude any warranties which arose prior to or at the time of the contract of sale.

## III. Fraud

The Lanhams' counterclaim alleged that Gold Kist fraudulently misrepresented that the Coker-77 corn seed had been adequately and fully tested and that when planted and cultivated properly, would yield a normal harvest. Gold Kist contends that the trial court should have directed a verdict against the Lanhams on the fraud action because there was no evidence of fraud. We agree.

The legal principles upon which a cause of action for fraud and deceit is based are familiar and settled:

> The [complainant], in order to recover in an action for fraud and deceit, must prove the elements thereof, such being: (1) A representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity; (5) his intent that it should be acted upon by the person; (6) the hearer's ignorance of its falsity; (7) his reliance on its truth; (8) his right to rely thereon; (9) and his consequent and proximate injury. The [complainant], having charged the [defendant] with fraud and deceit ... must establish the ... elements thereof by evidence that is clear, cogent and convincing and the failure to prove any one of [the elements] is fatal to recovery.

*Lundy v. Palmetto State Life Insurance Co.*, 256 S. C. 506, 510, 183 S. E. (2d) 335, 337 (1971).

Viewing the evidence in the light most favorable to the Lanhams, we find it to be susceptible of the sole inference that Gold Kist did not fraudulently misrepresent the Coker-77 corn seed to the Lanhams and therefore, the court erred in failing to direct a verdict for Gold Kist on the action.

First of all, the Lanhams offered no evidence of either a written or an oral representation by Gold Kist that the Coker-77 corn seed had been adequately tested. James Lan-

ham testified only that Gold Kist stated that the seed "would produce a high tonnage of corn silage per acre which would give ... a maximum amount of feed." The record contains no evidence of any other representations by Gold Kist.

In addition, the Lanhams failed to present evidence that Gold Kist knew that the Coker-77 seed would not yield a normal harvest. Although the Lanhams need not prove that Gold Kist had actual knowledge that the seed would not germinate and produce a normal yield, they were required to prove that Gold Kist made the representation that it would with reckless disregard of its lack of information as to the truth of the representation. *Goodwin v. Dawkins*, 282 S. C. 40, 317 S. E. (2d) 449 (1984); *Gilbert v. Mid-South Machinery Co.*, 267 S. C. 211, 227 S. E. (2d) 189 (1976).

Uncontradicted evidence reveals that Gold Kist tested (or had others test) the germination rate of the seed lots from which the Lanhams' seed was taken a month or two before the sale. These tests indicated that the seed would germinate at or above the industry-approved rate of germination. The Lanhams rely on evidence that within a month to six months after sale of the seed, additonal tests revealed that the germination rate of the seed was below industry standards. They argue that this evidence, along with evidence that Gold Kist blended low germinating seed with high germinating seed lots for resale, raises an inference that Gold Kist knew that the seed it sold the Lanhams would not produce a normal crop yield. While the evidence may raise an inference that the seed sold the Lanhams was defective, it certainly raises no inference that Gold Kist had reason to know the seed was defective. All the evidence reveals that Gold Kist relied on its germination tests which indicated that the seed would germinate properly. For this reason the court erred in failing to direct a verdict against the Lanhams on their action for fraud.

## IV. Evidence

Gold Kist finally contends the court erred in excluding from evidence the deposition of John Luke, an employee of the Georgia Department of Agriculture.

Gold Kist deposed Luke approximately four months before trial. At that time, Luke was both living and working in Georgia. During presentation of its evidence, Gold Kist offered Luke's deposition. The court inquired whether Gold Kist knew if Luke was still in Georgia. Counsel for Gold Kist replied, "I'm assuming he's still in Fitzgerald [Georgia]." Gold Kist argues that this evidence established that Luke was beyond the subpoena power of the State and his deposition was admissible under Circuit Court Rule 87(d)(3).[4] We disagree.

In *Stone v. Guaranty Bank & Trust Co.*, 270 S. C. 331, 242 S. E. (2d) 404 (1978), the Court held that a deposition is not properly admitted into evidence on counsel's bare assertion that according to his understanding the witness is out of State. The Court noted that the evidence revealed no attempt by the offering party to contact or subpoena the witness to determine his availability to testify. Although the facts in this case are slightly different from those in *Stone*, nevertheless, they reveal Gold Kist made no effort whatsoever to determine Luke's availability for trial. For this reason, we find no abuse of discretion by the court in excluding the deposition.

In addition, Gold Kist failed to establish a sufficient record on which adequate review of the issue could be made. Gold Kist did not set forth in the transcript of record a proffer of the evidence it sought to introduce. Assuming *arguendo* the court erred in excluding the deposition, without the proffer we cannot determine the prejudicial nature of the error. Without a showing of prejudice, the Court will not reverse a judgment for alleged error in the exclusion of evidence. *Sturkie v. Sifly*, 280 S. C. 453, 313 S. E.(2d) 316 (Ct. App. 1984); *Benya v. Gamble*, 282 S. C. 624, 321 S. E. (2d) 57 (Ct. App. 1984).

---

[4] Rule 87(d)(3) provides:

At the trial ... any part or all of a deposition ... may be used against any party ... in accordance with any one of the following provisions:

(3) The deposition of a witness ... may be used ... if the Court finds: (a) that the witness is dead; or (b) that the witness ... is out of the State of South Carolina. ...

## V. Disposition

Despite the trial court's erroneous submission of the ██ ██ fraud action to the jury, we nevertheless affirm the judgment entered on the verdict. The appellate courts of this State exercise every reasonable presumption in favor of the validity of a general verdict. Specifically, where a jury returns a general verdict in a case involving two or more issues or defenses and its verdict is supported as to at least one issue or defense, the verdict will not be reversed. *Anderson v. West*, 270 S. C. 184, 241 S. E. (2d) 551 (1978); *Hussman Refrigerator & Supply Co., v. Cash & Carry Grocer, Inc.*, 134 S. C. 191, 132 S. E. 173 (1926); 5 Am. Jur. (2d) *Appeal and Error* Section 787 (1962).

The trial court questioned counsel for the parties as ██ to the form of the verdict they wanted the jury to render:

COURT: Is there any reason why I should not submit this case to the jury on the question of [Gold Kist's] right to recover against [the Lanhams] for one set of verdicts and the right of [the Lanhams] to recover against [Gold Kist] on another set of verdicts ... If you don't like that now, I can just submit it to them on a [general verdict] ... [b]ut that wouldn't answer a lot of questions that you may want answered and that would put the jury in the business of determining an offset.
....
You just want a [general verdict]?
MR. KOSKO: (for Lanhams): Yes, sir....
COURT: All right. Then that's the way I'll do it....

Counsel for Gold Kist acquiesced in a general verdict after having been cautioned that the verdict would deprive Gold Kist of the jury's answers to the specific issues and defenses raised and could involve the jury in determining a set-off. Based on the "two-issue" rule, the jury's verdict for Gold Kist for $2,500 must be affirmed if it is supported by the evidence presented on the Lanhams' counterclaim for breach of warranties. Gold Kist does not contend the evidence fails to raise a question of fact for the jury on the issues of breach of express or implied warranties. Our own review reveals evidence which reasonably supports the jury's implicit find-

ing of a breach of warranty by Gold Kist. Consequently, the judgment entered for Gold Kist is

Affirmed.

BELL and GOOLSBY, JJ., concur.