621 S.E.2d 368

**Marshall ARMSTRONG, Respondent,**

v.

**Fred COLLINS, Jr., Appellant.**

**No. 4028.**

Court of Appeals of South Carolina.

Heard May 11, 2005.

Decided Oct. 3, 2005.

Rehearing Denied Nov. 17, 2005.

208

Charles E. Carpenter, Jr. and S. Elizabeth Brosnan, both of Columbia and Melvin Hutson and Lynn R. Hudson, both of Greenville, for Appellant.

James Richardson and Richard A. Harpootlian, both of Columbia and Richard J. Breibart, of Lexington, for Respondent.

BEATTY, J.:

Fred Collins, Jr., appeals from a jury award in favor of Marshall Armstrong on causes of action for fraud, constructive fraud, negligent misrepresentation, breach of fiduciary duty, breach of contract, and breach of contract accompanied by a fraudulent act. Collins argues the trial court erred in: (1) failing to direct a verdict as to all causes of action; (2) allowing Armstrong to amend his complaint to include the two breach of contract claims; and (3) failing to grant Collins a continuance based on the late amendment. We affirm.

## FACTS

Collins is the sole owner of Collins Entertainment, Inc., a conglomerate that owns and operates video games. Armstrong began working for Collins Entertainment in 1980, and he became president of the corporation in charge of day-to-day operations in 1998. Armstrong and Collins became friends, and prior to the litigation, Collins included Armstrong as a beneficiary under his will.

During the 1990s, video poker machines yielded Collins Entertainment gross annual revenues of about $63 million and net profits of $12 or $13 million per year. Video poker was Collins Entertainment's core product, from which it derived eighty percent of its gross revenues. In the early 1990s, Collins Entertainment borrowed $12 million from SouthTrust Bank to finance a public stock offering. SouthTrust secured its loan by taking a security interest in all of Collins Entertainment's business assets.[1] However, when cash payouts for video poker were outlawed effective July 1, 2000, Collins Entertainment was left without its most profitable product. *See Joytime Distribs. & Amusement Co. v. State,* 338 S.C. 634, 650, 528 S.E.2d 647, 655 (1999) (upholding the portion of the legislative act banning cash payouts effective July 1, 2000). Collins Entertainment owed SouthTrust somewhere between $13 and $20 million in principal and interest.

During this period, an idea was developed to alter old, existing bingo machines such that they could generate additional revenue. Armstrong testified that he came up with the idea when he noticed that the supreme court's opinion in *Joytime* excluded Class III Bingo machines. Although the licensing fee for Class III Bingo machines was $2000 per year, Armstrong discovered that older machines could be modified and licensed under a different class that had only a $100 per year licensing fee.

Armstrong testified that he discussed his idea with Collins, who was unconvinced at first. Collins allowed Armstrong to use some old machines that Collins owned personally to construct working models. Armstrong worked on the project during hours that he was not working for Collins Entertain-

---

1. Collins was not personally liable on this debt.

ment. Armstrong stated that he made four modifications to the machines, including adding an electronic circuit board, a flipper to bring the machine within the "game of skill" requirement for the lower licensing fee, and a printer to print tickets showing credits won which would be redeemable for merchandise. Armstrong applied for a patent for the new Skillpins machine.

Armstrong was interested in going into business for himself and wanted to work about fourteen more years before retirement. Because Collins Entertainment was so heavily laden with debt, Armstrong testified that Collins proposed that a separate entity be created to market the Skillpins machines. The new corporation would be ninety percent owned by Collins and ten percent owned by Armstrong. Armstrong would also be guaranteed a salary of $150,000 a year. Armstrong would later resign from Collins Entertainment and run the new corporation. Additionally, Armstrong testified that Collins agreed to personally borrow $1,000,000 from the bank, with Armstrong co-signing, to fund the endeavor. The agreement, however, was never reduced to writing.

Collins instructed Armstrong to go to Europe to secure exclusive distribution agreements for the new venture, later called Skillpins, Inc. The trips were successful, resulting in agreements with G.A.A., Seeben, and Splin S.A. The agreements were executed in the Skillpins name, as instructed by Collins. Skillpins was to use separate contracts, delivery slips, and work slips. Collins Entertainment paid for the trips, but Skillpins was to reimburse Collins Entertainment once it became profitable. Employees of Collins Entertainment also accompanied Armstrong on the trip. Dennis Cosentino, one of the employees who traveled with Armstrong, testified that during the trip, Armstrong was the most excited he had seen him in twenty years because Armstrong was going to be a part owner. Armstrong testified that he would not have made these trips but for the promise of part ownership.

When the corporation later began operating, separate contracts were employed for Skillpins machines, even if Collins Entertainment machines were already operating at the location. Collins had never previously created a corporation for a specific product in South Carolina. Armstrong continued to

work on the Skillpins project during hours he was not working for Collins Entertainment, and he executed agreements using the Skillpins name.

Tim Youmans, an attorney working for Collins Entertainment and later for Armstrong, testified that Collins told him that he had decided to give Armstrong ten percent of the new corporation that was to be separate and unencumbered by the SouthTrust debt. According to both Youmans and Armstrong, Collins instructed Youmans to find a shell corporation owned by Collins personally that was not encumbered with the SouthTrust debt. Youmans found a corporation meeting the criteria, and the corporation's name was changed to Skillpins, Inc. On the same date, another corporation under the Collins Entertainment umbrella was renamed Skill Flippers, LLC. This entity was to be the distribution vehicle for Skillpins, Inc. However, it was never used for that purpose.

The agreement between Armstrong and Collins was to be reduced to writing later by Richard Cox, an outside attorney for Collins Entertainment. Eventually, Armstrong and Collins met with Cox. According to Armstrong, Collins informed Cox that Skillpins was to be an entity completely separate from Collins Entertainment, that Armstrong would own ten percent of the corporation, and that Collins wanted to be a silent partner. Cox testified that the parties' intent was to set up an independent entity with each having an ownership position. Collins gave Armstrong constant assurances that the paperwork would soon be generated. Cox never prepared the documents.

Collins held a meeting at Collins Entertainment with upper level management and he discussed Skillpins. Armstrong's recollection of the meeting was that Collins informed the other employees that Skillpins was Armstrong's idea, and that a separate corporation was to be formed of which Armstrong would own ten percent. Collins recalled stating that he had offered Armstrong ten percent of Collins Entertainment, not ten percent of Skillpins.

By November of 2000, two or three hundred Skillpins machines were operating and producing income.[2] At that

---

2. The goal was to have 2,400 machines in operation after the first two years.

time, Armstrong discovered information concerning Skillpins was included in Collins Entertainment's profit and loss statement. Armstrong confronted Collins, and Collins confirmed that Skillpins had been brought under the Collins Entertainment umbrella. Collins offered Armstrong ten percent of Collins Entertainment. Armstrong refused, saying he did not want ten percent of the $13 to $20 million debt. Collins laughed and said he did not think Armstrong would. Armstrong immediately resigned.

Skillpins, Inc., purchased all the Skillpins machines. However, Collins Entertainment paid for the machines and booked all the machines as Collins Entertainment assets. Collins Entertainment started another patent application, listing Collins and his son as the inventors. This application was never filed. Within thirty days after litigation ensued, Skillpins, Inc. was dissolved. In 2001, Skillpins machines generated sixty-seven and one-half percent of Collins Entertainment's revenues.

After Armstrong resigned, he formed his own corporation with Youmans as a minority shareholder. At the time of the hearing, Armstrong's corporation operated about 250 Skillpins machines and over 100 video redemption games. However, Armstrong's declining health forced him to stop working full-time after January of 2001.

Armstrong brought an action against Collins alleging fraud, constructive fraud, negligent misrepresentation, breach of fiduciary duty, and violation of South Carolina's Unfair Trade Practices Act, and the case was tried before a jury. In his opening statement, counsel for Armstrong stated that the case was "about whether or not there was a contract between Fred Collins and Marshall Armstrong." Counsel further stated that the question for the jury was whether they had a meeting of the minds. However, counsel for Collins later objected to admission of evidence of the financial success of video poker in part on the ground that no breach of contract had been alleged in this case.

At the close of Armstrong's case, he moved to amend the complaint to add causes of action for breach of contract and breach of contract accompanied by a fraudulent act, arguing that the existence of a contract was implicit in the factual basis

for the case. Counsel for Collins objected on the ground that they were unable to conduct discovery and cross-examine witnesses with these causes of action in mind. The court granted the amendment, finding no prejudice because the existence of a contract was an integral part of the case. However, the court allowed defense counsel to recall Armstrong for further cross-examination. Collins then moved for a continuance or adjournment, which was denied. Later, Collins testified on direct that he and Armstrong "never had a meeting of the minds" and that their agreement never got past "step two."

Armstrong then rested, and Collins immediately moved for a directed verdict on all causes of action. The trial court granted the motion with respect to the unfair trade practices cause of action but denied the motion on all other causes of action. At the close of the evidence and again after the verdict, defense counsel renewed the motion, and the trial judge reiterated its prior ruling.

The case was submitted to a jury on a special verdict form. The jury found for Armstrong on all six causes of action, awarding $300,000 for each cause of action. The jury also awarded $1.2 million in punitive damages. When asked by the trial court for clarification of the verdict, the foreperson responded that the jury calculated actual damages of over $1.7 million and rounded up to $1.8 million. They then simply divided the total by six, intending to find for the plaintiff on all causes of action. Without objection, the court enrolled the actual damages as a general verdict for $1.8 million. The court denied all of Collins' other motions. This appeal followed.

## STANDARD OF REVIEW

 "In ruling on directed verdict or JNOV motions, the trial court is required to view the evidence and the inferences that reasonably can be drawn therefrom in the light most favorable to the party opposing the motions." *Sabb v. South Carolina State Univ.*, 350 S.C. 416, 427, 567 S.E.2d 231, 236 (2002). The trial court is only concerned with the "existence or nonexistence of evidence." *Long v. Norris & Assocs.*, 342 S.C. 561, 568, 538 S.E.2d 5, 9 (Ct.App.2000). "When the

evidence yields only one inference, a directed verdict in favor of the moving party is proper." *Id.* However, "if more than one reasonable inference can be drawn from the evidence, the case must be submitted to the jury." *Id.* On appeal from the denial of a motion for a directed verdict or JNOV, this court will reverse the trial court only when there is no evidence to support the ruling. *Creech v. South Carolina Wildlife & Marine Res. Dep't,* 328 S.C. 24, 29, 491 S.E.2d 571, 573 (1997).

## LAW/ANALYSIS

### I. Directed Verdict

Collins argues the trial court erred by failing to grant him a directed verdict because Armstrong failed to prove all the necessary elements for each of the six causes of action that went to the jury. Collins also argues that he should have been granted a directed verdict because the alleged agreement was unenforceable. Collins asserts the parties could not legally have entered into a contract that would deprive SouthTrust Bank of its security interest. We address each of these arguments below.

#### A. Fraud/Constructive Fraud/Negligent Misrepresentation

Collins argues that Armstrong failed to produce evidence to support fraud, constructive fraud, and negligent misrepresentation because Armstrong had no right to rely upon representations that Skillpins would be separate from Collins Entertainment. Collins argues that any such representation would have been inconsistent with knowledge Armstrong, as president of Collins Entertainment, would have gained regarding the SouthTrust Bank loan. We disagree.

To sustain a claim of fraud, all of the following elements must be proven:

> (1) a representation; (2) its falsity; (3) its materiality; (4) either knowledge of its falsity or reckless disregard of its truth or falsity; (5) intent that the representation be acted upon; (6) the hearer's ignorance of its falsity; (7) the hearer's reliance on its truth; (8) the hearer's right to rely thereon; and (9) the hearer's consequent and proximate injury.

*Regions Bank v. Schmauch,* 354 S.C. 648, 672, 582 S.E.2d 432, 444–45 (Ct.App.2003). "The right to rely must be determined in light of the plaintiffs duty to use reasonable prudence and diligence under the circumstances in identifying the truth with respect to the representations made to him." *Id.* at 672, 582 S.E.2d at 445. Fraud must be shown by clear and convincing evidence. *Ardis v. Cox,* 314 S.C. 512, 515, 431 S.E.2d 267, 269 (Ct.App.1993). A party may not rely upon a misstatement of fact when the truth is easily within his reach. *King v. Oxford,* 282 S.C. 307, 312, 318 S.E.2d 125, 128 (Ct.App.1984). "It is the policy of the courts not only to discourage fraud, but also to discourage negligence and inattention to one's own interests." *Id.* However, a party may rely on representations without making further inquiry when a fiduciary or confidential relationship exists between the parties. *Epstein v. Howell,* 308 S.C. 528, 530–31, 419 S.E.2d 379, 380–82 (Ct.App.1992).

" 'To establish constructive fraud, all elements of actual fraud except the element of intent must be established.' " *Pitts v. Jackson Nat'l Life Ins. Co.,* 352 S.C. 319, 333, 574 S.E.2d 502, 509 (Ct.App.2002) (quoting *Ardis v. Cox,* 314 S.C. 512, 515, 431 S.E.2d 267, 269 (Ct.App.1993)). "Neither actual dishonesty of purpose nor intent to deceive is an essential element of constructive fraud while intent to deceive is an essential element of actual fraud." *Ardis,* 314 S.C. at 516, 431 S.E.2d at 269–70. Actual fraud is distinguished from constructive fraud by the presence or absence of the intent to deceive. *Pitts,* 352 S.C. at 334, 574 S.E.2d at 509. "However, in a constructive fraud case, where there is no confidential or fiduciary relationship, and an arm's length transaction between mature, educated people is involved, there is no right to rely." *Ardis,* 314 S.C. at 516, 431 S.E.2d at 270.

In a negligent misrepresentation action, a plaintiff must prove the following:

(1) the defendant made a false representation to the plaintiff, (2) the defendant had a pecuniary interest in making the statement, (3) the defendant owed a duty of care to see that he communicated truthful information to the plaintiff, (4) the defendant breached that duty by failing to exercise due care, (5) the plaintiff justifiably relied on the represen-

tation, and (6) the plaintiff suffered a pecuniary loss as the proximate result of his reliance on the representation. *Brown v. Stewart,* 348 S.C. 33, 42, 557 S.E.2d 676, 680–81 (Ct.App.2001). The key difference between fraud and negligent misrepresentation is that "fraud requires the conveyance of a known falsity, while negligent misrepresentation is predicated upon transmission of a negligently made false statement." *Id.* "A duty to exercise reasonable care in giving information exists when the defendant has a pecuniary interest in the transaction." *Redwend Ltd. P'ship v. Edwards,* 354 S.C. 459, 474, 581 S.E.2d 496, 504 (Ct.App.2003). "The recovery of damages may be predicated upon a negligently made false statement where a party suffers either injury or loss as a consequence of relying upon the misrepresentation." *Winburn v. Ins. Co. of N. Am.,* 287 S.C. 435, 441, 339 S.E.2d 142, 146 (Ct.App.1985). A claim for negligent misrepresentation may be made when the misrepresented facts induced the plaintiff to enter a contract or business transaction. *Redwend,* 354 S.C. at 474, 581 S.E.2d at 504.

Each of the above causes of action contains the necessary element that the hearer had the right to rely upon the misrepresentation or fraud. Collins argues that Armstrong had no right to rely on the promise that he would be part owner of a corporate entity separate from Collins Entertainment because he was imputed with knowledge of the South-Trust Bank security interest in any potential new business due to his position as president of Collins Entertainment.

Viewing the evidence in the light most favorable to Armstrong, we find there was sufficient evidence to submit these causes of action to the jury. Armstrong testified that he was only in charge of day-to-day operations of Collins Entertainment, that he had no control over financial matters, and that he did not know what the SouthTrust Bank security agreement covered. Collins, not Armstrong, was a signatory to the agreement with SouthTrust Bank. Collins represented to Armstrong that he intended to create a new corporation, unencumbered by SouthTrust's security interest, in which Armstrong would have ten percent ownership. Great care was taken to locate a corporate shell owned by Collins personally, not by Collins Entertainment, in order to create Skillpins as a separate entity. Although some Collins Entertainment

resources were used in sending Armstrong to Europe, there is evidence that Collins, as Armstrong's longtime friend, assured him that Skillpins would be separate from Collins Entertainment. Further, evidence was presented that Collins intended to personally sign a loan for the startup money for Skillpins. Thus, evidence existed that Armstrong had the right to rely upon Collins' promises that Skillpins would be a separate entity.

Because evidence existed to support the element of Armstrong's right to rely, the trial court correctly denied Collins' motions for a directed verdict with regard to fraud, constructive fraud, and negligent misrepresentation. The matter was appropriately sent to the jury.

### B. Breach of Fiduciary Duty

Collins asserts the trial court erred in denying his motion for a directed verdict as to Armstrong's cause of action for breach of fiduciary duty. He maintains that no fiduciary relationship existed. We disagree.

"A confidential or fiduciary relationship exists when one imposes a special confidence in another, so that the latter, in equity and good conscience, is bound to act in good faith and with due regard to the interests of the one imposing the confidence." *Island Car Wash, Inc. v. Norris*, 292 S.C. 595, 599, 358 S.E.2d 150, 152 (Ct.App.1987). A relationship must be more than casual to equal a fiduciary relationship. *Steele v. Victory Sav. Bank*, 295 S.C. 290, 368 S.E.2d 91 (Ct.App. 1988). "Courts of equity have carefully refrained from defining the particular instances of fiduciary relationship in such a manner that other and perhaps new cases might be excluded and have refused to set any bounds to the circumstances out of which a fiduciary relationship may spring." *Island Car Wash, Inc.*, 292 S.C. at 599, 358 S.E.2d at 152; *see Burwell v. South Carolina Natl. Bank*, 288 S.C. 34, 41, 340 S.E.2d 786, 790 (1986) ("As a general rule, mere respect for another's judgment or trust in his character is usually not sufficient to establish such a [fiduciary] relationship. The facts and circumstances must indicate that one reposing the trust has foundation for his belief that the one giving advice or presenting arguments is acting not in his own behalf, but in the interests of the other party.").

221

*Pitts v. Jackson Natl. Life Ins. Co.*, 352 S.C. 319, 330, 574 S.E.2d 502, 507 (Ct.App.2002). Thus, to determine whether a fiduciary relationship existed, this court must look to the particulars of the relationship between the parties. *Id.*

Viewing the evidence in the light most favorable to Armstrong, there was sufficient evidence to send the cause of action for breach of fiduciary duty to the jury. Evidence was presented at trial that Armstrong and Collins intended Skillpins to be a separate entity from Collins Entertainment. Armstrong testified that Collins assured him that he would create a business entity that would be separate from Collins Entertainment's debts. Armstrong was entrusted to develop the Skillpins product, test it, and obtain manufacturers. Thus, evidence existed that the parties had a special relationship, separate from Collins Entertainment, in which each entrusted the other to act in good faith and with due regard for the interests of the other. Because evidence existed of a fiduciary relationship, the trial court properly denied Collins' motion for a directed verdict.

## C. Breach of Contract Claims

Collins next argues that the trial court should have directed a verdict on Armstrong's claims for breach of contract and breach of contract accompanied by a fraudulent act. He argues Collins only promised to give Armstrong a gift in the future that did not amount to a contract. Thus, he argues, there was no contract, and he was entitled to a directed verdict as to both contract causes of action.[3] We disagree.

The required elements of a contract are an offer, acceptance, and valuable consideration. *Sauner v. Pub. Serv. Auth. of South Carolina*, 354 S.C. 397, 406, 581 S.E.2d 161, 166 (2003). "A contract is an obligation which arises from actual agreement of the parties manifested by words, oral or

---

3. Collins also mentions in his brief that there was "no evidence of any accompanying fraud." However, he fails to present any argument or caselaw in support of this assertion. Thus, this argument is abandoned on appeal and we decline to address it. *See First Sav. Bank v. McLean*, 314 S.C. 361, 363, 444 S.E.2d 513, 514 (1994) (noting that where a party fails to cite any supporting authority or where the argument is merely a conclusory statement, the issue is deemed abandoned on appeal).

written, or by conduct." *Roberts v. Gaskins,* 327 S.C. 478, 483, 486 S.E.2d 771, 773 (Ct.App.1997). Valuable consideration may consist of "some right, interest, profit or benefit accruing to one party or some forbearance, detriment, loss or responsibility given, suffered or undertaken by the other." *Prestwick Golf Club, Inc. v. Prestwick Ltd. P'ship,* 331 S.C. 385, 389, 503 S.E.2d 184, 186 (Ct.App.1998). A benefit to the promisor or a detriment to the promisee may provide sufficient consideration for a contract. *Shayne of Miami, Inc. v. Greybow, Inc.,* 232 S.C. 161, 167, 101 S.E.2d 486, 489 (1957). If the evidence as to the existence of a contract is conflicting or raises more than one reasonable inference, the issue should be submitted to the jury. *Hendricks v. Clemson Univ.,* 353 S.C. 449, 459, 578 S.E.2d 711, 716 (2003). With certain exceptions, a contract need not be in writing to be enforceable. *Gaskins v. Firemen's Ins. Co. of Newark, N.J.,* 206 S.C. 213, 216, 33 S.E.2d 498, 499 (1945) (noting that if there is a meeting of the minds with regard to the essential elements of a contract, it is immaterial whether the contract is written or oral).

 Having a contract is a prerequisite to proving breach of contract accompanied by a fraudulent act. To prove this cause of action, a plaintiff must show: (1) a breach of contract; (2) fraudulent intent relating to the breaching of the contract and not merely to its making; and (3) a fraudulent act accompanying the breach. *Floyd v. Country Squire Mobile Homes, Inc.,* 287 S.C. 51, 53–54, 336 S.E.2d 502, 503–04 (Ct.App.1985). "Fraudulent intent is normally proved by circumstances surrounding the breach." *Id.* "The fraudulent act may be prior to, contemporaneous with, or subsequent to the breach of contract, but it must be connected with the breach itself and cannot be too remote in either time or character." *Id.* at 54, 336 S.E.2d at 504.

Viewing the evidence in the light most favorable to Armstrong, we find there was evidence that a contract was formed and, thus, both contract causes of action were properly submitted to the jury. Collins maintained that the parties never had a meeting of the minds and that the only offer he ever made Armstrong was for ten percent of Collins Entertainment. However, Armstrong and Youmans both testified that Collins offered to create a new entity unencumbered by the

SouthTrust debt and that Armstrong would be a ten percent owner. Armstrong further testified that he accepted Collins' offer and procured the exclusive distribution agreements in reliance on the agreement. The consideration for Collins was his agreement to capitalize the new business entity. Armstrong's consideration was his agreement to continue working for Collins Entertainment while developing the new Skillpins product on his own time, despite his desire to go into business for himself.

Because the evidence conflicted, a jury question existed as to whether a contract was formed. Thus, the trial court properly denied the motion for a directed verdict and sent the two contract causes of action to the jury.

### D. Unenforceability of Contract

Collins argues the trial court erred in failing to grant him a directed verdict as to all of Armstrong's causes of action because the alleged agreement was unenforceable. He argues that he did not have the legal ability to enter into the alleged contract with Armstrong because any such agreement would unlawfully deprive SouthTrust Bank of its interest in its collateral. We disagree.

Generally, courts will not enforce contracts that are illegal or violate public policy. *See White v. J.M. Brown Amusement Co., Inc.,* 360 S.C. 366, 371, 601 S.E.2d 342, 345 (2004) ("The general rule, well established in South Carolina, is that courts will not enforce a contract when the subject matter of the contract or an act required for performance violates public policy as expressed in constitutional provisions, statutory law, or judicial decisions."); *see also Beach Co. v. Twillman, Ltd.,* 351 S.C. 56, 64, 566 S.E.2d 863, 866 (Ct.App. 2002) (holding that illegal contracts are void and unenforceable, such that actions for its breach may not be maintained). However, we find this issue is not preserved for appellate review.

In arguing for a directed verdict as to the three fraud causes of action, Collins' counsel argued that Armstrong had no right to rely because "the question of whether this could, in fact, be done was a serious question" in light of the bank obligations. Although counsel argued that Armstrong had no

right to rely because he should have inquired about the bank obligations, Collins' counsel did not argue, as he does in his appellate brief, that the contract was illegal and unenforceable because it violated SouthTrust Bank's security agreement. Because this argument was not presented to the trial court in support of Collins' motion for a directed verdict, the court was never given the opportunity to rule upon whether the agreement was unenforceable. Accordingly, the matter is not preserved and we decline to address it. *Staubes v. City of Folly Beach*, 339 S.C. 406, 412, 529 S.E.2d 543, 546 (2000) (holding that matters not raised to or ruled upon by the trial court are not preserved for appellate review).

## E. Failure to Prove Damages

Collins contends the trial court should have granted his motion for a directed verdict as to all causes of action because Armstrong failed to prove damages. He argues that because Armstrong benefited from starting his own corporation after leaving Collins Entertainment, Armstrong cannot show that he sustained any damages from a breach of the alleged agreement. We disagree.

Initially, we note Collins only moved for a directed verdict for failure to prove damages as to the claims for fraud, constructive fraud, and negligent misrepresentation, arguing that Armstrong failed to prove Skillpins was profitable and that Armstrong would have suffered no change in salary. Thus, the argument Collins raises on appeal regarding the benefit to Armstrong from any alleged breach was never presented to the trial court. Further, Collins never raised any argument before the trial court with regard to damages as to the breach of contract and breach of contract with fraudulent intent causes of action. Accordingly, Collins' current argument on appeal is not preserved for appellate review. *Staubes*, 339 S.C. at 412, 529 S.E.2d at 546; *Gurganious v. City of Beaufort*, 317 S.C. 481, 488, 454 S.E.2d 912, 916 (Ct.App.1995) (holding that a party may not argue one ground at trial and an alternate ground on appeal).

Assuming the issue is preserved for our review, we find there was sufficient evidence of damages to submit the case to the jury. In order for damages to be recoverable, the

evidence should be sufficient to "enable the court or jury to determine the amount thereof with reasonable certainty or accuracy." *Whisenant v. James Island Corp.*, 277 S.C. 10, 13, 281 S.E.2d 794, 796 (1981). "While neither the existence, causation nor amount of damages can be left to conjecture, guess or speculation, proof with mathematical certainty of the amount of loss or damage is not required." *Id.*

Armstrong presented evidence of damages in the form of the loss of his salary and the loss of ten percent of Skillpins' profits. Evidence was presented that Armstrong was to receive a guaranteed yearly salary of $150,000, which he lost as a result of the breach. At the time of the agreement, Armstrong expected to work approximately fourteen more years before retiring. However, Armstrong retired shortly after starting his own corporation for health reasons. Thus, Armstrong presented a range of damages from lost salary of $150,000 for one year of work up to $2.1 million over fourteen years.

Armstrong also presented evidence that Collins' actions deprived him of the agreed-upon ten percent of the expected profits from Skillpins. Armstrong and Collins planned to have 2,400 Skillpins machines in operation after two years. The machines were eventually placed in the name of Collins Entertainment. Skillpins machines accounted for about two-thirds of the corporation's revenue after their first full year of operation. The 2001 gross profit from about 400 machines amounted to nearly $2.7 million, with a net profit of approximately $650,000. Ten percent of the 2001 net profit would have amounted to $65,000. Armstrong testified that when all 2,400 machines were in operation, the expected yearly gross profit would have been $16 million, and the net profit, around twenty percent of that, would have been $3.2 million. Armstrong expected to share in ten percent of the net, or $320,000 per year, once the corporation installed all 2,400 machines. Thus, Armstrong presented evidence of lost profits ranging from $65,000 per year up to $320,000 per year.

Viewing the evidence in the light most favorable to Armstrong, evidence was presented regarding damages from Collins' actions. Accordingly, we find the trial court properly denied Collins' motion for a directed verdict regarding lack of

proof of damages. Further, the jury's verdict of $1.8 million was declared a general verdict by the trial court and was well within the range of damages shown by Armstrong. Because the verdict was a general verdict, we cannot now speculate as to how the jury allocated damages. *See Gold Kist, Inc. v. Citizens and Southern Nat'l Bank of S.C.*, 286 S.C. 272, 282, 333 S.E.2d 67, 73 (Ct.App.1985) ("The appellate courts of this State exercise every reasonable presumption in favor of the validity of a general verdict.").

## II. Amendment and Request for Continuance

Collins asserts the trial court erred in allowing Armstrong to amend his complaint to add causes of actions for breach of contract and breach of contract accompanied by fraudulent act and in refusing to grant a continuance or adjournment.

### A. Amendment of the Complaint

Collins argues the trial court erred in allowing Armstrong to conduct the lawsuit based on the alleged fraudulent failure of Collins to create a contract and then amend the complaint on the theory that there was a contract. We disagree.

Initially, we note that Collins misconstrues Armstrong's complaint. Rule 8, SCRCP allows inconsistent causes of action; however, we find nothing in the complaint that alleges Collins failed to create a contract. To the contrary, paragraph 3 of the complaint avers "Plaintiff and Defendant agreed to the formation of a corporation...." Paragraph 6 states "The Plaintiff carried out his obligations;" and paragraph 8 avers "... **the Plaintiff had performed under the contract** ..." (emphasis added). Thus, contrary to Collins' allegation that Armstrong alleged no contract was formed in the complaint, Armstrong clearly alleges that the parties already had a contract.

If a party seeks to amend his pleadings greater than thirty days after a responsive pleading has been filed, he may only do so by leave of the court or with express consent of the other parties. Rule 15(a), SCRCP. Leave to amend the pleadings "shall be freely given when justice so requires and does not prejudice any other party." *Id.* Amendments may

228

also be made to conform the pleadings to the evidence when issues not pled are tried by express or implied consent of the parties. Rule 15(b), SCRCP. However, implied consent will not be found if all the parties did not recognize it as an issue at trial, even if evidence in the record exists to support the amendment. *Dunbar v. Carlson,* 341 S.C. 261, 268, 533 S.E.2d 913, 917 (Ct.App.2000).

"Motions to amend pleadings to conform to proof may be made upon motion of any party at any time, even after judgment. . . ." *Ball v. Canadian Am. Express Co.,* 314 S.C. 272, 275, 442 S.E.2d 620, 622 (Ct.App.1994). "Amendments to conform to the proof should be liberally allowed when no prejudice to the opposing party will result." *Harvey v. Strickland,* 350 S.C. 303, 313, 566 S.E.2d 529, 535 (2002); *Kelly v. S.C. Farm Bureau Mut. Ins. Co.,* 316 S.C. 319, 323, 450 S.E.2d 59, 61 (Ct.App.1994) (holding that amendments are to be freely granted when justice requires and there is no prejudice to any other party).

"A motion to amend is addressed to the sound discretion of the trial judge, and the party opposing the motion has the burden of establishing prejudice." *Kelly,* 316 S.C. at 323, 450 S.E.2d at 61. The prejudice that Rule 15 contemplates is lack of notice that the new issue is to be tried and lack of a full opportunity to introduce testimony to refute it. *Soil & Material Eng'rs, Inc. v. Folly Assoc.,* 293 S.C. 498, 501, 361 S.E.2d 779, 781 (Ct.App.1987).

Although Armstrong's counsel believed that facts were alleged in the complaint to support the two contract causes of action, he moved, "out of an abundance of caution," to amend the pleadings to conform to the proof presented at trial pursuant to Rule 15(b), SCRCP. Despite Collins' argument that the contract causes of action were never pled and he was prejudiced by the surprise amendment, the trial court found that the contract causes of action were an integral part of the case.

In determining whether the amendment was proper pursuant to Rule 15(b), SCRCP, we must first address whether the issue of breach of contract was tried by express or implied consent of the parties. In *Dunbar v. Carlson,* 341 S.C. 261, 533 S.E.2d 913 (Ct.App.2000), this court analyzed implied

consent to try a particular issue. In that case, the plaintiff sued the defendant for dental malpractice, and the defendant cross-examined the plaintiff's daughter regarding the time period during which she warned her mother that the defendant was not giving her adequate care. Based on the daughter's answers, the defendant moved to amend his pleadings to include the affirmative defense that the statute of limitations had run. Although the plaintiff did not object to the daughter's testimony and was not aware of the defendant's intention, the trial court allowed the amendment and immediately granted the defendant's subsequent motion for a directed verdict. This court reversed, holding that there was no implied consent to try the statute of limitations issue where the daughter's testimony was admissible for another purpose and she failed to recognize that the defendant intended to assert the statute of limitations. *Dunbar*, 341 S.C. at 268, 533 S.E.2d at 917.

Although Collins cites *Dunbar* in support of his argument, we believe the facts in this case are distinguishable. In *Dunbar*, the plaintiff had concluded her case when a new affirmative defense was raised and directed verdict immediately granted. In the case at bar, Armstrong's unamended complaint alleged "The subject matter of this litigation involves contractual obligations...." The complaint also alleged that the parties had a contract and that Armstrong performed under the contract. Moreover, in his opening statement, Armstrong's counsel stated the case concerned whether or not there was a contract between Collins and Armstrong. He informed the jury that it was their job to determine whether there was a meeting of the minds. Although Armstrong testified he had a verbal agreement with Collins, Collins' counsel cross-examined Armstrong regarding whether the agreement was actually just a promise to do something in the future. Tim Youmans, an attorney who initially worked for Collins Entertainment and later worked for Armstrong in his new enterprise, testified that Collins informed him that Armstrong would get ten percent of a new corporation that would be a separate entity from Collins Entertainment and the SouthTrust debt. Further, Collins had not begun his defense when the amendment was made.

We find there is sufficient evidence in the record indicating the existence of a contract was an issue at trial. Although

Collins' counsel noted early in the trial that the issue of breach of contract had not been pled in the case, he questioned Armstrong and Youmans about the particulars of any alleged agreement and whether it was an actual agreement or merely a promise to do something in the future. Armstrong testified extensively that the parties entered into an oral agreement, he trusted Collins would fulfill his end of the bargain, and he would have ten percent of Skillpins, a corporation free and clear of the SouthTrust debt. Thus, despite counsel's assertions at trial that breach of contract was not an issue, both parties elicited testimony regarding a contract and the issue was tried by implied consent. Because whether a contract existed was such an integral part of this case, we do not find that Collins was taken by surprise as was the plaintiff in *Dunbar*.

We next turn to whether Collins was prejudiced by the amendment. In considering potential prejudice, the court should consider whether the opposing party has had the opportunity to prepare for the issue now being formally raised. *Soil & Material Eng'rs, Inc. v. Folly Assoc.*, 293 S.C. 498, 501, 361 S.E.2d 779, 781 (Ct.App.1987); *see also Pool v. Pool*, 329 S.C. 324, 328, 494 S.E.2d 820, 823 (1998) (citing *Folly Assoc.* for the premise that the prejudice contemplated by Rule 15, SCRCP, is the lack of opportunity to refute any new evidence connected with the amended complaint). Armstrong moved for the amendment after presenting all the evidence in support of his case. Collins objected to the amendment, arguing he was prejudiced because he did not have an opportunity to conduct discovery or to cross-examine Armstrong with the contract causes of action in mind. The trial court granted leave to amend, finding that the existence of a contract was an integral part of this case. The court gave Collins the option of recalling Armstrong for further cross-examination on the contract issue, however. Although Collins failed to recall Armstrong for cross-examination, he presented testimony that: the parties never had a "meeting of the minds;" there was never an agreement that Skillpins would be free from the SouthTrust debt; and Armstrong was only offered the gift of ten percent of Collins Entertainment.

Although Collins argued that he was prejudiced by the amendment because he would have asked different questions

on cross-examination and would have presented different evidence, he made no proffer of different questions or evidence, and he was allowed to recall Armstrong if he wanted to do so. We find, based on the facts of this case, that Collins failed to meet his burden of showing prejudice.

Further, we find the trial court's decision to allow the amendment was proper pursuant to Rule 15(a), SCRCP.[4] Although Armstrong's pleadings did not separately delineate causes of action for breach of contract or breach of contract accompanied by a fraudulent act, the facts in the pleadings alleged the following: (1) Armstrong and Collins had a special relationship in which Collins told Armstrong he could trust him; (2) Armstrong developed a business idea, and he and Collins agreed to the formation of a corporation to buy, sell, and distribute coin-operated machines; (3) the agreement between the parties was that Armstrong would receive ten percent of the newly-formed corporation plus a salary of $150,000 per year and that the new corporation would be separate from Collins' other business entities and debts; (4) that Armstrong performed under the contract; and (5) notwithstanding the contract between the parties, Collins pledged the new corporation to the bank to secure debts for his other companies and appropriated Armstrong's idea as his own. These factual allegations were sufficient to support a cause of action for breach of contract and breach of contract accompanied by fraudulent act. Because the allegations were clearly in the pleadings and the issue of the existence of an agreement was addressed at the trial, we find no prejudice to Armstrong in the amendment. Therefore, we find the trial court appropriately allowed the amendment.

In sum, we find the trial court did not abuse its discretion in allowing the amendment. Armstrong's complaint did not allege that Collins failed to create a contract, as Collins asserts. Clearly, the existence of a contract was an issue at trial, and Collins was not prejudiced by the amendment. Finally, Armstrong's complaint alleges facts that would support the causes

---

4. This court may affirm the trial court based on any grounds found in the record. Rule 220(c), SCACR; *I'on, LLC v. Town of Mount Pleasant*, 338 S.C. 406, 418, 526 S.E.2d 716, 722 (2000).

of action for breach of contract and breach of contract accompanied by fraudulent act.

## B. Continuance

Collins next asserts that even if the trial court properly granted leave to amend, it erred in refusing to continue or adjourn the case to give defense counsel time to prepare. We disagree.

The decision whether to grant leave to amend is within the sound discretion of the trial judge. *Soil & Material Eng'rs, Inc. v. Folly Assoc.*, 293 S.C. 498, 501, 361 S.E.2d 779, 781 (Ct.App.1987). However, when a late amendment would cause prejudice to the opposing party, the trial court should either deny the amendment or grant a continuance to allow the time reasonably necessary to prepare for the new issue. *Ball*, 314 S.C. at 275, 442 S.E.2d at 622. Nevertheless, the decision to grant or deny a continuance is a matter within the trial court's discretion. *Graybar Elec. Co. v. Rice*, 287 S.C. 518, 520, 339 S.E.2d 883, 884 (Ct.App.1986).

After the trial court denied Collins' motion for a directed verdict, he moved for a continuance or an adjournment of the trial, to "restart it sometime in the future," because he was taken by surprise that the contract causes of action would be a part of the trial. The trial court found the contract issue so completely integral and intertwined with the other issues in the case that a continuance or adjournment was unnecessary in light of the need for judicial economy. However, the court granted Collins the right to recall Armstrong as a witness at any point in the trial. Collins never recalled Armstrong for further cross-examination.

Moreover, Collins had notice of an alleged contract and its breach from the moment he was served with the complaint. He had ample time to conduct discovery and formulate questions on the issue. Considering the theory of his defense—that he only made a promise of a future gift—it is highly unlikely that Collins did not contemplate the contract issue.

As discussed above, Collins presented evidence in his case that there was no agreement. Thus, he failed to show any actual prejudice from the court's decision to allow the amendment. Based on these facts, we find no abuse of discretion in

the court's decision to deny the motion for a continuance at such a late date in the trial.

## CONCLUSION

We hold that the trial court correctly denied Collins' motion for directed verdict on all six remaining causes of action. We further hold that the damages issue was properly submitted to the jury. Finally, we find no abuse of discretion in allowing the amendment to the pleadings to include the contract causes of action and in denying the request for a continuance or adjournment. Accordingly, the judgment in favor of Armstrong is hereby

**AFFIRMED.**

HEARN, C.J. and SHORT, JJ., concur.